# In the United States Court of Federal Claims

No. 19-173
(Filed: 8 May 2020)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| AARON G. FILLER, *et al.*, | \* | |
| | \* | |
| Plaintiffs, | \* | Patent Infringement; RCFC 12(b)(1); |
| | \* | Motion to Dismiss; Subject Matter |
| v. | \* | Jurisdiction; Declaratory Judgment. |
| | \* | |
| THE UNITED STATES, | \* | |
| | \* | |
| Defendant. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Aaron G. Filler*, Tensor Law PC, of Santa Monica, CA, for plaintiffs.[1]

*Gary L. Hausken*, Director, Commercial Litigation Branch, Civil Division, Department of Justice, with whom was *Joseph H. Hunt*, Assistant Attorney General, both of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE**, **Judge**.

Plaintiffs accuse the government of infringing a single United States patent. The government filed a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") on 30 August 2019. After the parties submitted their respective briefs, plaintiffs filed a motion seeking leave to file a sur-reply, further responding to the government. This case was transferred to the undersigned Judge on 16 October 2019. The Court[2] granted plaintiffs' motion for leave to file a sur-reply and further allowed the government to respond to plaintiffs' sur-reply. Plaintiffs then filed a motion seeking a declaratory judgment by the Court to find a previously executed patent assignment void *ab initio*. The parties then submitted their respective briefs on this issue. The Court held oral argument 11 February 2020 covering both the government's motion to dismiss and plaintiffs'

---

[1] Attorney and doctor Aaron G. Filler, while representing himself as a named plaintiff, also serves as counsel of record for the remaining plaintiffs (all of which are business entities associated with Dr. Filler) through his role as an attorney with Tensor Law P.C. Additionally, Dr. Filler is one of the named inventors on the patent at issue in this case.

[2] This Opinion and Order addresses actions taken, and orders issued, by the undersigned Judge in addition to actions and orders by Senior Judge Damich on the Court of Federal Claims (in both the present case prior to transfer and in a previous litigation concerning the same cause of action). Throughout this Opinion and Order, "the Court" refers to actions and orders attributed to the undersigned Judge and "this Court" refers to actions and orders attributed to Judge Damich.

motion for a declaratory judgment.  For the following reasons, the Court **GRANTS** the government's motion to dismiss and **DENIES** plaintiffs' motion for a declaratory judgment.

## I.  Factual History

The Court draws the following facts from various filings related to the pending motions. Unless otherwise noted, such facts are undisputed between the parties.

On 31 January 2019, Dr. Filler, as an individual and on behalf of NeuroGrafix-Sole Proprietorship, filed the present action alleging the government infringes U.S. Patent No. 5,560,360 (the "'360 patent").  *See* Compl. at 1.  On 6 May 2019, plaintiffs filed a motion for joinder, seeking to join NeuroGrafix, Neurography Institute Medical Associates, Inc. ("NIMA"), and Image-Based Surgicenter Corporation ("IBS") as additional plaintiffs.  *See* Mot. for Joinder of NeuroGrafix, Neurography Institute Medical Associates, and Image-Based Surgicenter Corporation, ECF No. 12 ("Mot. for Joinder").  This Court granted plaintiff's motion for joinder on 10 June 2019, joining NeuroGrafix, NIMA, and IBS as parties.  *See* Order, ECF No. 24.  Dr. Aaron G. Filler, NeuroGrafix-Sole Proprietorship, NeuroGrafix, NIMA, and IBS are hereinafter collectively referred to as "plaintiffs."

### a.  Prior History of the '360 patent

The '360 patent was filed 8 March 1993, claiming priority to a series of foreign patent applications initially filed in the United Kingdom.  *See* U.S. Pat. No. 5,560,360 to Filler *et al.* at Cover Page.  There are four listed inventors on the '360 patent: "Aaron G. Filler;" "Jay S. Tsurda;" "Todd. L. Richards;" and "Franklyn A. Howe."  *Id.*  The '360 patent "discloses several methods for visualizing nerves and neural tracts that allowed the visualization [of] any such structure in the human body, by MRI scanning, without a contrast agent injection." Compl. ¶ 63. Among the methods disclosed in the '360 patent are two so-called "vector methods:"  Diffusion Anisotropy Imaging ("DAI") and Diffusion Tensor Imaging ("DTI").  *Id.*  DAI is a "more advanced" model "capable of detecting the true biological situation of multiple directions of neural tracts within a given imaged voxel of the brain."  *Id.* ¶ 64.  DTI on the other hand "is a simplified model that . . . treats each voxel imaged in the human brain as if there can only be one uniform direction of travel for neural tissue in that voxel and can be performed with as few as six directions of diffusion gradient measurement."  *Id.*  As compared to the uniform direction of travel in DTI, DAI "can require a much larger number of directions of acquisition (as many as 256 directions or more are sometimes obtained)."  *Id.*

Funding for the research resulting in the invention embodied in the '360 patent was at least partially provided by a series of research foundations in the United Kingdom.  First Am. Compl. ¶ 16.  Inventor Howe assigned his rights to St George's Hospital Medical School ("St. George's"), while the remaining inventors "Filler, Tsuruda [sic] and Richards assigned rights to the University of Washington."  *Id.*  "On March 23, 1994, the University of Washington exclusively licensed substantially all rights that it had in the technology of [the '360 patent] to the Washington Research Foundation" (hereafter "the 1994 License").  *Id.* ¶ 17.  St. Georges assigned "all rights that it had to the University of Washington" on 31 May 1994, whereupon the

University of Washington "exclusively license[d] all such rights to the Washington Research Foundation." *Id.*

"On December 7, 1998, the Washington Research Foundation exclusively licensed all rights that it had – excepting certain reversion rights – to [NeuroGrafix-Sole Proprietorship]. Subsequently, on December 21, 1998, [NeuroGrafix-Sole Proprietorship] exclusively licensed these rights – excepting certain reversion rights to [Neurografix]," another of the plaintiffs in this case. *Id.* ¶ 18.  "On 29 December 1998, the Washington Research Foundation and [NeuroGrafix] executed a confirmatory direct license to [NeuroGrafix] establishing the reversion right to [the Washington Research Foundation]" ("the 1998 License"), which contained an expiration date of 1 October 2012. *Id.*; *see also* Pls.' Mot. for Leave to File Documents Under Seal at Ex. 6, ECF No. 15 ("Pls.' Mot. for Leave").  On 14 June 2012, the Washington Research Foundation and NeuroGrafix executed an amendment to the 1998 License in order to "remove [the Washington Research Foundation] as a necessary party to actions where [NeuroGrafix] asserts the Patent Rights against Third Party infringers and related actions." ("the 2012 Amendment").  Pls.' Mot. for Leave at Ex. 4, p. 4; *see also* Tr. at 59:18–22, ECF No. 45 ("When we came to filing in the Court of Claims against the United States, [the Washington Research Foundation] said, we want to stop participating in these, how do we – – we revise our agreements, so get rid of our reversionary rights and get out of this so you can proceed without us . . . .").

In November 2013, Dr. Filler attempted to "withdr[aw] his original assignment" to the University of Washington in the hopes of establishing that "NeuroGrafix held exclusionary rights against the United States with no limitations, commencing from October 1, 2012 when all reversionary rights to other entities expired and through the expirations [sic] of the patent on October 1, 2013."  First Am. Compl. ¶¶ 20–21.  "In December of 2013, all rights as to all inventors, including a retroactive right to sue and the right to sue governments, were assigned from the State of Washington to the Washington Research Foundation." *Id.* ¶ 23.  The Washington Research Foundation then "assigned all rights to NeuroGrafix." *Id.*  "NeuroGrafix assigned all rights to Aaron G. Filler on December 27, 2013." *Id.*  This series of assignments in December 2013 are hereinafter collectively referred to as "the December 2013 Assignments."

### b.  Alleged Infringement by the Government

Plaintiffs allege initial attempts were made to resolve any claims of infringement against the government as early as 2009.  *See* Opp'n to Mot. to Dismiss at 22, ECF No. 28 ("Opp'n to MTD").  In April and October 2009, Dr. Filler sent a series of emails to the then-chief of the Section on Tissue and Biophysics and Biomimetrics of the National Institute for Health ("NIH"), Dr. Peter J. Basser, allegedly discussing the government's infringement of the '360 patent. *Id.* at Ex. U, W.  According to plaintiffs, Dr. Basser was "NIH's person most knowledgeable in this subject area." *Id* at 22.  Plaintiffs further contacted Dr. Elizabeth Nabel in December 2009, the then-Director of the National Heart Lung and Blood Institute ("NHLBI"). *Id.*  According to plaintiffs, "[t]he notice included a copy of the patent and an explanation that a license was required to avoid patent infringement." *Id.*  These initial attempts to resolve the infringement dispute allegedly provided "notification that a patent with an exclusive license to NeuroGrafix

existed which covered work ongoing at the NIH." *Id.* These alleged initial attempts were unsuccessful.

NeuroGrafix, NIMA, and IBS, three of the plaintiffs in this case, first filed suit in this Court in 2012 alleging infringement of the '360 patent. *See NeuroGrafix v. United States*, 111 Fed. Cl. 501 (2013) (hereafter "*NeuroGrafix I*" or "the *NeuroGrafix I* case"). At the time of *NeuroGrafix I*, NeuroGrafix claimed to be the exclusive licensee of the '360 patent as a result of the 1998 License. *Id.* at 503. "The Government moved this Court to dismiss the complaint for lack of jurisdiction," asserting "that nothing in the Complaint proved that [the University of Washington]—via [the Washington Research Foundation]—ha[d] transferred sufficient rights in the '360 Patent to the Plaintiffs to establish their standing to bring suit." *Id.* Following the conclusion of briefing, this Court "ordered that Plaintiff submit certain additional evidence" regarding the chain of assignment of the '360 patent. *Id.* at 504.

The various assignments and licenses granted NeuroGrafix "the right to bring infringement actions against a 'Third Party.'" *Id.* at 506. After reviewing the relevant assignments and licensing agreements transferring rights in the '360 patent, this Court found "[t]he parties expressly defined 'Third Party' in a manner that does not include the United States, and [NeuroGrafix] received the right only to sue Third Parties. Whatever the extent to which [the Washington Research Foundation] has a right to sue the United States . . . , [the Washington Research Foundation] did not pass that right on to [NeuroGrafix]." *Id.* at 507–08. Accordingly, this Court dismissed the action in *NeuroGrafix I* as the plaintiffs there did "not possess the necessary interests in the '360 patent to have standing to bring suit against the United States for infringement." *Id.* at 508.

### c. The Present Action

Following this Court's dismissal of *NeuroGrafix I*, Dr. Filler claims to have "withdr[awn] his original assignment, rendering [the] 1993 assignment null and void *ab initio* as of just before its moment of execution." Compl. ¶ 60. The '360 patent later expired on 1 October 2013. *See* Opp'n to MTD at 17. Plaintiffs then executed the December 2013 Assignments, allegedly perfecting the ownership interests of the various parties. *Id.* The purpose of these assignments was to "resolve[] the deficiencies as to standing that led this Court to grant a Motion to Dismiss" in *NeuroGrafix I*. Mot. for Joinder at 4.

Plaintiffs here allege patent infringement against the government under 28 U.S.C. § 1498 for the "uncompensated taking of a license as to U.S. Patent No. 5,560,360." Compl. at 1. Plaintiffs allege Dr. Filler is the assignee of all rights in the '360 patent via the December 2013 Assignments. *Id.* ¶ 60. Although Dr. Filler alleges he "alone has constitutional, and prudential standing" to bring the present action, NeuroGrafix, NIMA, and IBS "continuously held exclusionary rights in the '360 patent from 1998 through the present." Mot. for Joinder at 4. Their joinder "helps assure that their rights are adequately represented." *Id.*

According to plaintiffs, the government infringes plaintiffs' patent "based on the practice of the invention described in and covered by the '360 Patent by the hospitals and medical centers administered by" a number of governmental departments and agencies. Compl. ¶ 2. Among

those agencies accused of infringement are:  the Army; the Navy; the Air Force; Department of Veterans Affairs; and the Department of Health and Human Services.  *Id.*  Plaintiffs further allege the government induced infringement of the '360 patent "based on research contracts, grants and scientific projects involving 'extramural' or third-party entities or individuals."  *Id.* Among those departments and agencies accused of inducing infringement are:  National Science Foundation; Department of Energy; Department of Defense; Department of Health and Human Services; Department of Homeland Security; National Aeronautics and Space Administration; and the Defense Advanced Research Projects Agency.  *Id.*  Plaintiffs further allege Brainlab, Inc., Brainlab AG, and Brainlab Medizinische Computersysteme GmbH (collectively, "Brainlab") induce infringement of the '360 patent "by providing the software and teaching the use of collection of [allegedly infringing methods]."  *Id.* ¶¶ 8–9.[3]

## II.   Procedural History

Plaintiffs filed the present action on 31 January 2019.  *See* Compl.  As discussed *supra*, plaintiffs filed a motion for joinder on 6 May 2019, seeking to join three additional parties as plaintiffs.  *See* Mot. for Joinder.  This Court granted plaintiffs' motion on 10 June 2019.  *See* Order, ECF No. 24.  This Court ordered plaintiffs to file an amended complaint within 30 days of the issuance of the order granting the motion for joinder.  *See id.*  On 10 July 2019, plaintiff filed an amended complaint.  *See* First Am. Compl.

On 30 August 2019, the government filed a motion to dismiss for lack of subject matter jurisdiction.  *See* Mot. of the United States to Dismiss for Lack of Jurisdiction, ECF No. 27 ("MTD").  Plaintiffs responded to the government's motion to dismiss on 28 September 2019. *See* Opp'n to MTD.  On 15 October 2019, the government filed a reply to plaintiffs' opposition to the motion to dismiss.  *See* Reply of the United States to Pls.' Opp'n to the Mot. to Dismiss for Lack of Jurisdiction, ECF No. 30 ("Reply to Opp'n to MTD").  This case was transferred to the undersigned Judge on 16 October 2019.  *See* Order, ECF No. 31.

Shortly thereafter, plaintiffs filed a motion for leave to file a sur-reply, seeking to "briefly address a series of new arguments raised for the first time" in the government's reply to plaintiffs' opposition to the motion to dismiss.  *See* Pls.' Mot. for Leave to File Sur-Reply, ECF No. 33 ("Mot. for Leave for Sur-Reply").  Plaintiffs appended the sur-reply ("Sur-Reply") to the motion seeking leave.  *See* Mot. for Leave for Sur-Reply at Ex. 1.  The Court granted plaintiffs' motion for leave to file a sur-reply, further permitting the government to file a response.  *See* Order, ECF No. 34.  The government responded to plaintiffs' sur-reply on 3 December 2019. *See* Response of the United States to Pls.' Sur-Reply to the Mot. to Dismiss for Lack of Jurisdiction, ECF No. 35 ("Resp. to Sur-Reply").

---

[3] The jurisdiction of the Court of Federal Claims "is confined to the rendition of money judgments in suits brought for that relief against the United States, and if the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of the court."  *United States v. Sherwood*, 312 U.S. 584, 588 (1941) (citation omitted).  To the extent plaintiffs allege any cause of action against private parties in the complaint, such allegations must be dismissed as they are beyond the Court's jurisdiction.

On 12 December 2019, plaintiffs filed a motion for declaratory judgment asking the Court to find a previous patent assignment void *ab initio*.  *See* Mot. for Declaratory J. of Void Ab Initio Status of Patent Assignment, ECF No. 40 ("Mot. for Decl. J.").[4]  The government filed a response to plaintiffs' motion for declaratory judgment on 20 December 2019.  *See* Opp'n to Filler's Mot. for Declaratory J. of Void *Ab Initio*, ECF No. 41 ("Opp'n to Mot. for Decl. J.").  On 29 December 2019, plaintiffs filed a reply to the government's response to plaintiffs' motion for declaratory judgment.  *See* Reply to US Opp'n to Mot. for Declaratory J. of Void Ab Initio Status of Patent Assignment, ECF No. 42 ("Reply to Opp'n to Mot. for Decl. J.").  Oral argument on both the government's motion to dismiss and plaintiffs' motion for declaratory judgment was held 11 February 2020.  *See* Order, ECF No. 43.

## III.  Government's Motion to Dismiss

### a.  Applicable Law

#### 1.  Standard of Review for Motion to Dismiss Pursuant to RCFC 12(b)(1)

Plaintiffs "bear the burden of establishing the court's jurisdiction by a preponderance of the evidence."  *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (citing *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)).  "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Id.* (quoting *Trusted Integration*, 659 F.3d at 1163) (internal quotation marks omitted).  Where a party "denies or controverts the pleader's allegations of jurisdiction" in a Rule 12(b)(1) motion to dismiss, "the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction."  *Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).  "In such a case, the allegations in the complaint are not controlling, and only uncontroverted factual allegations are accepted as true for purposes of the motion."  *Id.*  When presented with a challenge to the Court's jurisdiction based on such denials or contention of jurisdictional allegations, "the court may consider evidence outside the pleadings to resolve the issue."  *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572 (Fed. Cir. 1996).

#### 2.  Jurisdictional Requirements for Bringing a Claim Pursuant to 28 U.S.C. § 1498

When the government is accused of patent infringement, the claim is brought before this Court pursuant to the authority of 28 U.S.C. § 1498:

---

[4] Plaintiffs filed its original Motion for Declaratory Judgment of Void Ab Initio Status of Patent Assignment, ECF No. 38, on 9 December 2019.  Later that same day, plaintiffs filed a first Corrected Motion for Declaratory Judgment of Void Ab Initio Status of Patent Assignment, ECF No. 39.  Three days later, on 12 December 2019, plaintiffs filed a second Corrected Motion for Declaratory Judgment of Void Ab Initio Status of Patent Assignment, ECF No. 40.  The government does not raise any objections to plaintiffs' multiple corrected filings.  Accordingly, the Court will treat plaintiffs' second Corrected Motion for Declaratory Judgment of Void Ab Initio Status of Patent Assignment, ECF No. 40, as the controlling document on this motion.

Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

As a waiver of the United States' sovereign immunity from suit, § 1498 "must be strictly construed in favor of the United States." *Zoltek Corp. v. United States*, 672 F.3d 1309, 1318 (Fed. Cir. 2012) (citing *Blueport Co. v. United States*, 533 F.3d 1374, 1378 (Fed. Cir. 2008)). "[I]in order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit." *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003) (emphasis omitted).

Claims of patent infringement may only be asserted during the life of the patent. *See Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1550 (Fed. Cir. 1994) ("Because the rights flowing from a patent exist only for the term of the patent, there can be no infringement once the patent expires."). The statute of limitations for bringing all claims before the United States Court of Federal Claims is set forth in 28 U.S.C. § 2501: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." "With respect to a patent taking, a cause of action arises under 28 U.S.C. § 1498(a) when the 'accused [instrumentality] is first available for use, and it is when the use occurs that a license is considered to have been taken.'" *Unitrac, LLC v. United States*, 113 Fed. Cl. 156, 160–61 (2013), *aff'd* 589 Fed. App'x. 990 (Fed. Cir. 2015) (quoting *Decca Ltd. v. United States*, 544 F.2d 1070, 1082 (Ct. Cl. 1976)). "Alleged ongoing infringement does not extend or restart the limitations period. Rather, once the device is available for use, the license is taken, the patent owner's cause of action accrues, and the patent owner has six years to bring its case." *Ross-Hime Designs, Inc. v. United States*, 139 Fed. Cl. 444, 459 (2018) (citing *Starobin v. United States*, 662 F.2d 747, 749 (Ct. Cl. 1981)).

In limited circumstances, the statute of limitations for claims of infringement against the United States government may be tolled where the patentee files an administrative claim:

In the case of claims against the United States government for use of a patented invention, the period before bringing suit, up to six years, between the date of receipt of a written claim for compensation by the department or agency of the Government having authority to settle such claim, and the date of mailing by the Government of a notice to the claimant that his claim has been denied shall not be counted as part of the period referred to in the preceding paragraph.

35 U.S.C. § 286.

"The purpose behind the statute is to provide the government time to carefully consider potential claims, and possibly correct its mistakes, before having to proceed with costly litigation." *Dow Chemical Co. v. United States*, 32 Fed. Cl. 11, 20 (1994), *aff'd in part, rev'd in part on other grounds*, 226 F.3d 1334 (Fed. Cir. 2000). An administrative claim must be

"sufficiently detailed to afford the Government a realistic opportunity to consider and settle the claim." *Leonardo v. United States*, 55 Fed. Cl. 344, 352 (2003) (quoting *Custer v. United States*, 622 F.2d 554, 558 (Ct. Cl. 1980)).  Certain government agencies specifically define the requirements of filing an administrative claim regarding patent infringement.  *See, e.g.*, 48 C.F.R. Subpart 227.70 (defining the requirements for submitting an administrative claim of patent infringement against the Department of Defense).  Where the government agency does not provide such requirements, this Court previously required, at a minimum, "a written claim for compensation [notifying] the correct agency . . . of the underlying facts of a claim pending against the government and stat[ing] a sum certain for the damages." *Leonardo*, 55 Fed. Cl. at 352–53.

### 3.  Collateral Estoppel

The doctrine of collateral estoppel, otherwise known as issue preclusion, "protects a defendant from the burden of litigating an issue that has been fully and fairly tried in a prior action and decided against the plaintiff." *Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1537 (Fed Cir. 1995) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313 (1971)).  Collateral estoppel "applies only when the same issue has been decided in one case and arises in another."  18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4417 (3d ed. 2019).  To satisfy the elements of collateral estoppel, a defendant must show:  (1) "the issues are identical to those in a prior proceeding;" (2) "the issues were actually litigated;" (3) "the determination of the issues was necessary to the resulting judgment;" and (4) "the party defending against preclusion had a full and fair opportunity to litigate the issues." *Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001) (citing *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1365–66 (Fed. Cir. 2000)).[5]  "Collateral estoppel requires that a party have had an opportunity to appeal a judgment as a procedural matter."  *Id.* at 1355.  Evaluation of these factors includes consideration of "the existence of substantial overlap between evidence and argument, whether the new evidence or argument involves application of the same rules of law, . . . and the closeness of the relationship between the claims involved in the two proceedings."  18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4417 (3d ed. 2019).

### 4.  The Assignment of Claims Act

Specific to the jurisdiction of this Court, the Assignment of Claims Act governs the "transfer or assignment of any part of a claim against the United States Government or of an interest in the claim."  31 U.S.C. § 3727(a)(1).  "An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued."  31 U.S.C. 3727(b).  As this Court previously noted, "[a]ssignments of patent rights are subject to the Assignment of Claims Act, and voluntary assignments of patent claims are

---

[5] As the Federal Circuit applies the law of the regional circuit in which the trial court sits for procedural matters such as collateral estoppel, the Court utilizes the factors as applied by the Federal Circuit when deciding a case on appeal from the Court of Federal Claims.  *See Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed. Cir. 2003) (applying the law of the regional circuit to "procedural issues not unique to [the Federal Circuit's] exclusive jurisdiction," such as application of the doctrine of collateral estoppel).

ineffective against the government unless they qualify for one of the[] judicially-recognized exceptions or otherwise do not run afoul of the purposes of the Act." *3rd Eye Surveillance, LLC v. United States*, 133 Fed. Cl. 273, 277 (2017). "Plaintiffs are the original claimants only for infringement claims that arose after the patents [are] assigned to [plaintiffs]." *Id.* at 278.

### b. Discussion

#### 1. Parties Arguments

The government argues this Court lacks "jurisdiction over the claims alleged in the complaint" for three reasons: (1) the '360 patent expired on 1 October 2013, thus precluding enforcement of any infringement occurring after such date; (2) "the Assignment of Claims Act prohibits recovery on all of Plaintiff's remaining claims, as every claim accrued prior to Plaintiff's acquisition of rights in the '360 patent" on 27 December 2019; and (3) "all alleged claims arising prior to January 31, 2013, are time barred as they accrued more than six years before the filing of the complaint." MTD at 5. Intertwined with the government's above arguments is application of the doctrine of collateral estoppel to prevent plaintiffs from relitigating this Court's previous decision in *NeuroGrafix I*. *See* Reply to Opp'n to MTD at 12 ("In any event, the doctrine of collateral estoppel precludes re-litigation of [the *NeuroGrafix I*] holding today.").

Plaintiffs do not dispute the expiration date of the '360 patent. *See* Opp'n to MTD at 17. Plaintiffs do, however, dispute the application of the six-year statute of limitations. *See id.* According to plaintiffs, the various emails sent in 2009 tolled the applicable statute of limitations because they constituted a written claim with the department or agency possessing authority to settle the claim. *Id.* Lastly, plaintiffs argue this Court's previous decision in *NeuroGrafix I* does not have any *res judicata* effect. *Id.* at 4. As a result, plaintiffs argue the Assignment of Claims Act is inapplicable to the present dispute. *Id.* at 17–18.

#### 2. Time Period of Infringement Liability

The statute of limitations for claims of patent infringement against the government is six years. *See* 28 U.S.C. § 2501. This six-year period begins accruing when the government uses or manufactures the patented invention, resulting in the government's effective taking of a license. *See Unitrac*, 113 Fed. Cl. at 161. The six-year period does not "extend or restart" when the government is accused of ongoing infringement. *Ross-Hime Designs*, 139 Fed. Cl. at 458. Plaintiffs filed the complaint in this action on 31 January 2019. *See* Compl. at 1. Therefore, absent any tolling[6] of the six-year statute of limitations, any actionable infringement under 28 U.S.C. § 1498(a) must have first accrued on or after 31 January 2013.

Similar to how the applicable statute of limitations establishes an initial date for when plaintiffs may first assert infringement against the government, expiration of the '360 patent establishes an end date after which plaintiffs may no longer assert infringement against the

---

[6] Plaintiffs' arguments regarding potential tolling of the six-year statute of limitations are addressed in this order *infra* at Section III.b.5.

government.  Claims of patent infringement may only be asserted during the life of the patent.
*See Kearns*, 32 F.3d at 1550.  The parties concur the '360 patent expired on 1 October 2013.  *See*
MTD at 10 ("Plaintiff claims infringement . . . of the '360 patent, which expired on October 1,
2013."); Opp'n to MTD at 17 ("expiration of the patent on October 1, 2013").  Any claims for
infringement of the '360 patent accruing after 1 October 2013 are not actionable, a point
acknowledged by plaintiff's counsel during oral argument:

> THE COURT:  [D]o you agree, Mr. Filler, October 2013 claims are barred by the
> expiration of the patent?
>
> PLAINTIFFS' COUNSEL:  I agree with that, yes.

Tr. at 9:14–18, ECF No. 45.  Accordingly, plaintiffs cannot recover for claims of patent
infringement against the government after 1 October 2013.

As the statute of limitations bars plaintiffs from recovering for infringement prior to 31
January 2013, and the expiration of the '360 patent bars plaintiffs from recovering for
infringement after 1 October 2013, the primary period of actionable infringement analyzed is this
eight-month period: 31 January 2013 to 1 October 2013.  Plaintiffs' arguments regarding tolling
of the six-year statute of limitations—for potential government liability before 31 January
2013—is addressed in Section III.b.5 *infra*.

### 3.  Application of Collateral Estoppel to the 1994 License, the 1998 License, and the 2012 Amendment

Evaluating plaintiffs' claims for infringement prior to 1 October 2013 requires
establishing the proper party possessing the right to enforce the '360 patent against the
government during this period.  In *NeuroGrafix I*, this Court construed both the 1994 License
and the 1998 License to determine which party possessed the right to enforce the '360 patent
against the government at that time.  *See NeuroGrafix I*, 111 Fed. Cl. at 506.  This Court found
the 1998 License did not transfer the right to enforce the '360 patent against the government from
the Washington Research Foundation to NeuroGrafix.  *See id.* at 508.  While this Court
recognized NeuroGrafix as the exclusive licensee of the '360 patent, NeuroGrafix only received
the rights to enforce the '360 patent against third parties.  Pursuant to this Court's interpretation
of the 1994 License and the 1998 License, third parties did not include the government.  *Id.* at
507–08.  Specifically, this Court found as follows in *NeuroGrafix I*:

> In the [1994 License], the Court finds support for the conclusion that [the
> Washington Research Foundation] retained the right to sue governmental parties.
> Like the [1998 License], the [1994 License] contains a definition of "Third Party":
> "corporate entities or individuals other than [the Washington Research Foundation]
> or [the University of Washington]."  As with the [1998 License], the [1994 License]
> grants the licensee ([the Washington Research Foundation]) the right to bring suit
> against such Third Parties.  Although the Court makes no decision on this point, the
> [1994 License] indicates that at least [the Washington Research Foundation] was
> aware that the United States could qualify as a Third Party: in an Article entitled

"Third Party Rights," two of the three provisions deal with potential rights that the United States government may have in the technology being licensed. The presence of the United States in these "Third Party Rights" provisions in the [1994 License]—and the complete lack of a similar language in the [1998 License]—tells the Court that [the Washington Research Foundation] did not intend to grant [NeuroGrafix] the right to sue the United States. . . . The parties expressly defined "Third Party" in a manner that does not include the United States, and [NeuroGrafix] received the right only to sue Third Parties. Whatever the extent to which [the Washington Research Foundation] has a right to sue the United States (and the Court makes clear that it makes no finding on that point), [the Washington Research Foundation] did not pass that right on to [NeuroGrafix].

*Id.* (internal citations omitted).

In *NeuroGrafix I*, this Court determined that to whatever extent the Washington Research Foundation has a right to enforce the '360 patent against the government, it "did not pass that right on to [NeuroGrafix]" in the 1998 License. *Id.* at 508. Applying this Court's interpretation of the 1998 License from *NeuroGrafix I* to the present case, the right to enforce the '360 patent against the government was not transferred from the Washington Research Foundation to the plaintiffs in this case until execution of the December 2013 Assignments. *See id.* at 507 ("The parties expressly defined 'Third Party' in a manner that does not include the United States, and [NeuroGrafix] received the right only to sue Third Parties."). According to plaintiffs, however, the decision in *NeuroGrafix I* was flawed because it overlooked an important provision in the 1998 License.

As clarified by plaintiffs' counsel during oral argument, plaintiffs' position is premised on disregarding the decision in *NeuroGrafix I* based on an alleged misinterpretation of the 1998 License. *See, e.g.*, Tr. at 25:5–7, ECF No. 45 ("So our argument is that this was made by a – – it is a gross error, a mistake by Judge Damich . . . ."); *id.* at 26:6–12 (describing this Court's decision in *NeuroGrafix I* as "completely wrong. In fact, there's identical language [discussing government rights in the licensed technology]. [The Court] just missed it. . . . [The Court] was struggling with it, I think, and just sua sponte came up with this solution and made this mistake."). Plaintiffs argue this Court failed to recognize Section 10 of the 1998 License, which is also present in the 2012 Amendment, entitled "Government Rights." *Id.* at 25:24–27:5; Pls.' Mot. for Leave at Ex. 4, p. 9. According to plaintiffs, paragraph 10 provides the precise language "deal[ing] with potential rights that the United States government may have in the technology being licensed," which the *NeuroGrafix I* decision found absent in the 1998 License. *NeuroGrafix I*, 111 Fed. Cl. at 507. When reviewing the 1998 License, this Court observed "the complete lack of a similar language in the [Washington Research Foundation to NeuroGrafix] Agreement." *Id.* Plaintiffs therefore argue the decision in *NeuroGrafix I* is inapplicable to the present case because the 1998 License was wrongly interpreted; this Court's decision allegedly turned on whether the 1998 License contained language dealing "with potential rights that the United States government may have in the technology being licensed." *Id.*; *see also* Tr. at 25:24–27:5, ECF No. 45.

In the present action, the government argues "the doctrine of collateral estoppel precludes re-litigation of [the *NeuroGrafix I*] holding today." Reply to Opp'n to MTD at 12. According to the government, plaintiffs effectively ask the Court to disregard the decision in *NeuroGrafix I*, stating: "[*NeuroGrafix I*] was based on the Court's reading of an intervening license from the Washington Research Foundation to NeuroGrafix. The current case is based on an entirely different set of exclusive licenses in which [NeuroGrafix-Sole Proprietorship] was a party and in which the previously adjudicated [2012 Amendment] plays no controlling role." Opp'n to MTD at 4.

Whether this Court properly interpreted paragraph 10 of the 1998 License is not a matter properly brought before the Court in the present action. If plaintiffs sought to challenge the accuracy of this Court's interpretation of the 1998 License, there are vehicles in place for taking such actions: plaintiffs could have filed a motion for reconsideration pursuant to RCFC 59 or appealed this Court's decision pursuant to RCFC 58.1. *See also Ullman v. United States*, 64 Fed. Cl. 557, 571 (2005), *aff'd* 151 Fed. App'x 941 (Fed. Cir. 2005) (citing *MGA, Inc. v. Gen. Motors Corp.*, 827 F.2d 729, 731–32 (Fed. Cir. 1987) ("The proper course for a dissatisfied litigant to redress legal errors is through appeal, not by collateral attack on the judgment in a separate lawsuit.")). Plaintiffs chose to do neither.

In fact, during oral argument, plaintiffs' counsel acknowledged dissatisfaction with the result in *NeuroGrafix I* at the time of the opinion and order.

> THE COURT: [W]as there a motion for reconsideration filed or an appeal?
>
> PLAINTIFFS' COUNSEL: There wasn't. . . . [Plaintiffs' previous counsel] said, this is such an outrageous ruling, you're going to get your case messed up, we should proceed in District Court. We shouldn't try to appeal it, it will only mess up in District Court to have conflicting decisions like this.

Tr. at 28:15–29:5, ECF No. 45. Plaintiffs, at the time *NeuroGrafix I* was decided, made a business decision not to appeal the *NeuroGrafix I* decision. *Id.*; *see also* Opp'n to MTD at 15 ("Arguably NeuroGrafix could have repaired the situation and re-filed by joining either [the Washington Research Foundation] and/or [NeuroGrafix-Sole Proprietorship] as Plaintiffs and filing a new case in the Court of Federal Claims in 2013, but it chose to defer on re-filing until the [multi-district litigation] had progressed to completion."). The present action, more than six years after *NeuroGrafix I*, does not provide plaintiffs with an opportunity to attack the previous judgment of this Court.

The Court must only determine whether the issue resolved in *NeuroGrafix I* is the same issue presented by plaintiffs in the present case such that the doctrine of collateral estoppel bars plaintiffs from relitigating the issue. *See Comair Rotron*, 49 F.3d at 1537 ("The principle of collateral estoppel . . . protects a defendant from the burden of litigating an issue that has been fully and fairly tried in a prior action and decided against the plaintiff."). Collateral estoppel requires: (1) "the issues are identical to those in a prior proceeding;" (2) "the issues were actually litigated;" (3) "the determination of the issues was necessary to the resulting judgment;"

and (4) "the party defending against preclusion had a full and fair opportunity to litigate the issues." *Banner*, 238 F.3d at 1354.

### i.    Identical Issues Presented

First, the issues presented in the present case must be "identical to those in a prior proceeding." *Id.* Accordingly, the Court must determine whether each of the 1994 License, the 1998 License, and the 2012 Amendment present an identical issue to that presented in *NeuroGrafix I*.[7]

In *NeuroGrafix I*, this Court directly interpreted both the 1994 License and the 1998 License. *See NeuroGrafix I*, 111 Fed. Cl. at 506–08. The interpretation of these licensing agreements was necessary to determine whether the plaintiffs in *NeuroGrafix I* possessed the right to enforce the '360 patent against the government. *Id.* at 507–08. The present action requires the Court to determine whether the plaintiffs in this case possessed the right to enforce the '360 patent for infringement occurring prior to expiration of the '360 patent, or 1 October 2013. As in *NeuroGrafix I*, this analysis similarly requires the Court to determine what rights were granted to the current plaintiffs via both the 1994 License and the 1998 License in order to properly trace the transfer of these rights. Thus, in both *NeuroGrafix I* and the present case, both the 1994 License and the 1998 License must be interpreted for the specific purpose of determining whether the right to enforce the '360 patent against the government was transferred. Interpretation of the same licensing agreements to determine the rights of the same parties presents an identical issue to that presented in *NeuroGrafix I*.

The issue presented by the 2012 Amendment in the present action is whether the licensing agreement transferred the right to enforce the '360 patent against the government from the Washington Research Foundation to plaintiffs. Plaintiffs are correct that the 2012 Amendment was not directly at issue in *NeuroGrafix I*. Opp'n to MTD at 16 ("The [2012 Amendment] That is the Basis of the Current Action Was Not Asserted in [*NeuroGrafix I*].""). The *issue* presented by the 2012 Amendment in the present action, however, is the identical issue presented by the 1998 License in *NeuroGrafix I*: whether the Washington Research Foundation transferred the right to enforce the '360 patent against the government to plaintiffs. The 2012 Amendment and the 1998 License are virtually identical documents, as the 2012 Amendment was executed as an amendment to the 1998 License. *Compare* Pls.' Mot. for Leave at Ex. 6 (2012 Amendment) *with id.* at Ex. 4 (1998 License). The purpose of the 2012 Amendment was to "remove [the Washington Research Foundation] as a necessary party to actions where

---

[7] The government does not argue for the application of collateral estoppel to extend to the December 2013 Assignments. *See* Reply to Opp'n to MTD at 12–13. The December 2013 Assignments had yet to be executed when this Court rendered its decision in *NeuroGrafix I*. The December 2013 Assignments transferred the right to enforce the '360 patent downstream of the 1994 License, the 1998 License, and the 2012 Amendment. Thus, the December 2013 Assignments effect only the transfer of rights occurring after those already interpreted in *NeuroGrafix I*. To the extent the Court finds the doctrine of collateral estoppel applicable to this Court's previous interpretation of plaintiffs' various licensing agreements, such a finding cannot extend to the December 2013 Assignments—at the time of the 2013 *NeuroGrafix I* decision, the December 2013 Assignments had yet to be executed and therefore could not have been presented by the plaintiffs in that case.

[NeuroGrafix] asserts the Patent Rights against Third Party infringers and related actions." *Id.* In all other aspects, the 2012 Amendment is identical to the 1998 License. *See* Tr. at 51:5–8 ("[T]hat's why we did the [2012 Amendment] was so we could sue the Government. So it was clear on both sides that that's what the amended agreement of June 2012 was supposed to do."). The 2012 Amendment does not materially alter any of the provisions of the 1998 License interpreted by this Court in *NeuroGrafix I* for determining what rights were transferred to the plaintiffs in the 1998 License. Therefore, the 2012 Amendment presents an identical issue regarding the transfer of ownership of the right to enforce the '360 patent against the government as the 1998 License.

### ii.    Issues Actually Litigated

Moving to the second collateral estoppel factor, the Court evaluates whether "the issues were actually litigated." *Banner*, 238 F.3d at 1354. In *Banner*, the Federal Circuit looked to whether the issue in the previous action "was properly raised by the pleadings, was submitted for determination, and was determined." *Id.* (citing Restatement (Second) of Judgments § 27). In *NeuroGrafix I*, the government raised the issue of the plaintiffs' ownership of the right to enforce the '360 patent against the government by challenging the plaintiffs' standing in a motion to dismiss pursuant to RCFC 12(b)(1). *NeuroGrafix I*, 111 Fed. Cl. at 503. Whether the plaintiffs in *NeuroGrafix I* possessed the right to enforce the '360 patent against the government was subject to extensive briefing by the parties, including this Court's order regarding submission of supplemental evidence and the parties' submission of supplemental briefing. *See id.* at 504 ("After reviewing all of the filings, questions remained in the Court's mind as to whether jurisdiction was appropriate in this case. To this end, the Court ordered that Plaintiff submit certain additional evidence . . . ."). This Court determined the 1994 License and the 1998 License did not transfer the plaintiffs the right to enforce the '360 patent against the government. *Id.* at 508 ("[T]he Court concludes that the Plaintiffs do not possess the necessary interests in the '360 Patent to have standing to bring suit against the United States for infringement."). The issue of whether plaintiffs received the right to enforce the '360 patent against the government was therefore actually litigated in *NeuroGrafix I*.

### iii.    Necessary Determination to Resulting Judgment

Regarding the third collateral estoppel factor, this Court now turns to whether "the determination of the issues was necessary to the resulting judgment." *Banner*, 238 F.3d at 1354. This inquiry often looks at "whether a particular issue was merely incidental to the first judgment." 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4421 (3d ed. 2019). In *NeuroGrafix I*, the only issue presented in the government's motion to dismiss was whether the plaintiffs possessed the necessary right to assert infringement of the '360 patent against the government. *NeuroGrafix I*, 111 Fed. Cl. at 503. The resulting judgment of *NeuroGrafix I* dismissed the case for lack of standing. *Id.* at 508. The lack of standing was the direct result of the plaintiffs' lack of possession of the necessary rights in the '360 patent. The issue of whether the plaintiffs possessed the necessary rights to enforce the '360 patent against the government, as the only issue before this Court, was therefore necessary to the determination of the resulting judgment.

#### iv.      Full and Fair Opportunity to Litigate

Fourth, and finally, the Court must determine whether "the party defending against preclusion had a full and fair opportunity to litigate the issues." *Banner*, 238 F.3d at 1354.  In determining whether a full and fair opportunity to litigate was afforded, the Federal Circuit looks at:  (1) "whether there were significant procedural limitations in the prior proceeding;" (2) "whether the party had an incentive to litigate fully the issue;" and (3) "whether effective litigation was limited by the nature or relationship of the parties." *Id.* at 1354.

Plaintiffs in the present action do not cite any perceived procedural limitations in *NeuroGrafix I*.  In *NeuroGrafix I*, the plaintiffs were NeuroGrafix, NIMA, and IBS.  *See NeuroGrafix I*, 111 Fed. Cl. at 503.  Each of these three parties are also plaintiffs in the present case, in addition to Dr. Filler and NeuroGrafix-Sole Proprietorship.  *See* First Am. Compl. ¶¶ 2–5.  All of the parties are business-related to one another and share a common interest in enforcing the '360 patent against would-be infringers.  *See* Mot. for Joinder at 16 ("Filler was an inventor, Filler was the CEO of NeuroGrafix[,] . . . Filler was the Medical Director and designated representative of NIMA and Filler was President and CEO of [IBS]."); *see also* First Am. Compl. ¶ 5 ("Plaintiff Aaron G. Filler, MD, PhD, JD, is an individual, also known as NeuroGrafix-Sole Proprietorship.").

All plaintiffs in the present action therefore had a strong incentive to fully litigate the issue in *NeuroGrafix I*.  Plaintiffs stated during oral argument that the decision not to appeal this Court's decision in *NeuroGrafix I* was a deliberate business decision in favor of the multi-district litigation, as plaintiffs purportedly disagreed with this Court's decision in *NeuroGrafix I* at the time it was rendered.  *See* Tr. at 29:1–5, ECF No. 45.  Application of the doctrine of collateral estoppel cannot be avoided as a result of such strategic decisions or disagreements with a legal ruling.  *Banner*, 238 F.3d at 1355 ("The mere disagreement with a legal ruling does not mean that a party has been denied a 'full and fair' opportunity to litigate.").  A party need not exercise their right to an appeal; collateral estoppel simply "requires that a party have had an opportunity to appeal a judgment as a procedural matter."  *Id.*

Lastly, plaintiffs provide no evidence of effective litigation being limited by the relationship of the parties.  Nothing before the Court suggests a material limitation was placed on the various plaintiffs as a result of their relationship with one another.  Plaintiffs do not allege they were deprived a fair opportunity to litigate this issue; rather, plaintiffs focus purely on the introduction of new evidence in the form of additional licensing agreements in an attempt to escape this Court's previous findings.

Accordingly, plaintiffs were afforded a full and fair opportunity to litigate whether they possessed the right to enforce the '360 patent against the government, based on the 1994 License and the 1998 License (and effectively the 2012 Amendment), in *NeuroGrafix I*.

#### v.      Licensing Agreements Subject to Collateral Estoppel

To whatever extent the non-party Washington Research Foundation has a right to enforce the '360 patent against the government, this right was retained during the period assessed in

*NeuroGrafix I.  NeuroGrafix I*, 111 Fed. Cl. at 508.  Neither the 1994 License, the 1998 License, nor the 2012 Amendment transferred the right to enforce the '360 patent against the government to any of the plaintiffs in the present case.

### 4.  Application of the Assignment of Claims Act to the December 2013 Assignments

As plaintiffs are collaterally estopped from relitigating whether the 1994 License, the 1998 License, or the 2012 Amendment transferred the right to enforce the '360 patent against the government, the Court now turns to plaintiffs December 2013 evidence transferring the right to enforce the '360 patent against the government from the Washington Research Foundation to plaintiffs following the decision in *NeuroGrafix I*.  The Assignment of Claims Act bars an assignee from recovering for claims of infringement occurring prior to the assignment of ownership of the patent.  *See* 31 U.S.C. § 3727.  Specific to the jurisdiction of this Court, the Assignment of Claims Act governs the "transfer or assignment of any part of a claim against the United States Government or of an interest in the claim."  *Id.* § 3727(a)(1).  "An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued."  *Id.* § 3727(b).  "[T]he Assignment of Claims Act generally renders ineffective voluntary assignments of unliquidated claims against the government."  *3rd Eye Surveillance*, 133 Fed. Cl. at 277 (citing *United States v. Shannon*, 342 U.S. 288, 291–92 (1952)).  As this Court previously noted, "[a]ssignments of patent rights are subject to the Assignments of Claims Act, and voluntary assignments of patent claims are ineffective against the government unless they qualify for one of the[] judicially-recognized exceptions or otherwise do not run afoul of the purposes of the Act."  *Id.*  "Plaintiffs are the original claimants only for infringement claims that arose after the patents [are] assigned to [plaintiffs]."  *Id.* at 278.  "Plaintiffs cannot bring any claims against the government that arose before [the date of assignment]" because plaintiffs in this case would not be the original claimant for such claims.  *Id.*

As discussed *supra*, plaintiffs are collaterally estopped from re-litigating who owned the right to enforce the '360 patent against the government based on any of the 1994 License, the 1998 License, or the 2012 Amendment.  The only remaining agreements potentially transferring the right to enforce the '360 patent against the government are the December 2013 Assignments.  Therefore, to whatever extent plaintiffs received the right to enforce the '360 patent against the government, plaintiffs did not obtain such rights until execution of the December 2013 Assignments on 27 December 2013.  The Assignment of Claims Act therefore bars plaintiffs from asserting the '360 patent against the government prior to this date.  *See id.* (finding the plaintiffs may only assert claims of infringement which occurred after the patents were assigned to them).  As the '360 patent expired 1 October 2013, prior to execution of the December 2013 Assignments, the December 2013 Assignments did not transfer any actionable right to enforce the '360 patent against the government.

### i.  Alter-ego Exception

Plaintiffs, however, cite to a 1994 Court of Federal Claims case and attempt to invoke one of the recognized exceptions to the application of the Assignment of Claims Act:  the so-

called "alter-ego" exception.  *See* Opp'n to MTD at 17–18.  In *MDS Associates, Ltd. v. United States*, the plaintiff assigned the allegedly infringed patent to "his alter-ego partnership."  31 Fed. Cl. 389, 394 (1994); *see also Ideal Innovations, Inc. v. United States*, 138 Fed. Cl. 244, 251 (2018) (noting the alter-ego exception to the Assignment of Claims Act would apply where the plaintiff was "the inventor and the President and CEO of both [business entities].").  In *MDS Associates*, this Court found the Assignment of Claims Act inapplicable because "the same individual or partners possessed the equitable ownership of the claims for purposes of infringement."  31 Fed. Cl. at 394.  Plaintiffs argue this exception applies to the assignments of ownership in this case, as "the damages were incurred by NeuroGrafix.  Only the right to authorize NeuroGrafix to sue for its 2013 damages were transferred."  Opp'n to MTD at 18.

In applying the Assignment of Claims Act to the present case, the inquiry must begin with the transfer of the right to enforce the '360 patent against the government (to the extent any such right even exists).  *See* 31 U.S.C. § 3727(a)(1) ("a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim").  At the time of the *NeuroGrafix I* decision, to the extent any party possessed a right to enforce the '360 patent against the government, the Washington Research Foundation possessed such a right.  The purpose of the December 2013 Assignments was to transfer this right from the Washington Research Foundation to plaintiffs, thereby correcting the perceived defects in the chain of ownership recognized by this Court in *NeuroGrafix I*.  First Am. Compl. ¶ 23 ("In December of 2013, all rights as to all inventors, including a retroactive right to sue and the right to sue governments, were assigned from the State of Washington to the Washington Research Foundation.  The [Washington Research Foundation] assigned all rights to NeuroGrafix . . . [and] NeuroGrafix assigned all rights to [Dr. Filler].").  Unlike *MDS Associates*, where the transfer of ownership effectively remained with the same party when the exclusive licensee of the patent at issue was transferred to "his alter-ego partnership, by virtue of [an] amendment to the agreement," the December 2013 Assignments transferred the right to enforce the '360 patent between two independent parties with no suggestion of any shared ownership between the parties.  *Compare id.* (discussing the transfer of ownership between the Washington Research Foundation and NeuroGrafix, two unrelated parties) *with MDS Associates*, 31 Fed. Cl. at 394 (discussing the transfer of ownership between the exclusive licensee of the patent and his alter-ego partnership).

As the government points out, "[t]here is no question that [the Washington Research Foundation] is not an 'alter ego' of NeuroGrafix or vice versa."  Reply to Opp'n to MTD at 12 n. 6.  There is nothing to indicate the Washington Research Foundation and plaintiffs are so interrelated as to warrant application of the so-called "alter-ego" exception to the Assignment of Claims Act.  Plaintiffs' counsel admitted as much during oral argument:

> THE COURT:   But the alter ego issue is the transfer – – is related to the [Washington Research Foundation] transfer to NeuroGrafix, right? . . . [I]t would have to say that [the Washington Research Foundation] and NeuroGrafix are the same.

> PLAINTIFFS' COUNSEL:   That's not the case.   [The Washington Research Foundation] is a totally separate entity, yes.  That's no alter ego.

Tr. at 82:9–16, ECF No. 45.

Plaintiffs argument is incorrectly premised on plaintiffs' possession of the right to enforce the '360 patent against the government as a result of the 1998 License, in direct contravention of *NeuroGrafix I* and the plain language of the Assignment of Claims Act. Before execution of the December 2013 Assignments, any potential damages as a result of the government's infringement of the '360 patent accrued to the Washington Research Foundation. The December 2013 Assignments did not merely transfer "the right to authorize NeuroGrafix to sue for its 2013 damages." Opp'n to MTD at 18. Rather, the December 2013 assignments transferred the Washington Research Foundation's accrued damages to plaintiffs. The right to recover damages accrued to another party are specifically barred by the Assignment of Claims Act. *See* 31 U.S.C. § 3727(b) ("An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued."). Plaintiffs thus fail to qualify for this exception to the Assignment of Claims Act.

## ii.   Government Waiver

Plaintiffs further assert the government waived application of the Assignment of Claims Act "by not citing 31 USC §3727 against any then-existing or prior assignments in [*NeuroGrafix I*]." Opp'n to MTD at 19. The government argues waiver is inapplicable because the previous "case was decided on a jurisdictional motion, [and] the Government never had occasion to apply the Act, let alone waive it." Reply to Opp'n to MTD at 14 n. 9.

The government invokes the Assignment of Claims Act as a result of the December 2013 Assignments. As *NeuroGrafix I* was decided 7 June 2013, prior to execution of the December 2013 Assignments, the Assignment of Claims Act was neither an available, nor an applicable, defense to the government during the *NeuroGrafix I* litigation. Accordingly, plaintiffs' argument seeking waiver of the application of the Assignment of Claims Act fails. The right to enforce the '360 patent against the government was not transferred to plaintiffs until execution of the December 2013 Assignments on 27 December 2013. Plaintiffs could not raise the Assignment of Claims Act as a defense to an assignment of ownership which had not yet occurred. As other courts have noted, "a party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made." *Holzsager v. Valley Hospital*, 646 F.2d 792, 796 (2d Cir. 1981); *see also Glater v. Eli Lilly & Co.*, 712 F.2d 735, 738 (1st Cir. 1983) ("[Defendant] could not waive a defense involving facts of which it was not, and could not have been expected to have been, aware.").

The Assignment of Claims Act bars plaintiffs from receiving an enforceable right to recover for infringement accruing to another party prior to this transfer. Plaintiffs cannot satisfy the requirements for any recognized exception to the Assignment of Claims Act. Plaintiffs may not enforce a right to recover for infringement by the government which accrued to another party prior to the December 2013 Assignments. Accordingly, plaintiffs cannot satisfy the requirements necessary for this Court to maintain subject matter jurisdiction over claims for patent infringement of the '360 patent against the government.

### 5.   Tolling of the Statute of Limitations Prior to 31 January 2013

Although the Court finds plaintiffs did not possess the right to enforce the '360 patent against the government prior to the December 2013 Assignments, plaintiffs face an additional jurisdictional hurdle regarding any claims against the government pursuant to § 1498:  the statute of limitations for claims of patent infringement against the government is six years.  *See* 28 U.S.C. § 2501.  This six-year period begins accruing when the government uses or manufactures the patented invention, resulting in the government's effective taking of a license.  *See Unitrac*, 113 Fed. Cl. at 161.  The six-year period does not "extend or restart" when the government is accused of ongoing infringement.  *Ross-Hime Designs*, 139 Fed. Cl. at 458.  As discussed *supra*, plaintiffs filed the complaint in this action on 31 January 2019.  *See* Compl. at 1.  Thus, unless plaintiffs can establish that the six-year statute of limitations was tolled, any actionable infringement under 28 U.S.C. § 1498(a) must have first accrued on or after 31 January 2013.

Where a party files a written claim with the department or agency possessing authority to settle the claim, the six-year limitations period may be tolled.  *See* 35 U.S.C. § 286.  To trigger a tolling of the relevant statute of limitations, this Court has previously required:  a written claim notifying the correct agency; recitation of the underlying facts of a claim against the government; and a sum certain for damages.  *See Leonardo*, 55 Fed. Cl. at 352–53.

Plaintiffs argue two separate written claims were filed with the relevant agency possessing authority to settle the claim:  a series of emails to Dr. Peter Basser in April 2009 and October 2009; and a December 2009 email to Dr. Elizabeth Nabel.  *See* Opp'n to MTD at 22. Each of these emails are authored by Dr. Filler and allegedly sent to the necessary government officials.  *See id.*  Plaintiffs describe the emails as including "a copy of the patent and an explanation that a license was required to avoid patent infringement. . . . In these documents, officials of NIH received notification that a patent with an exclusive license to NeuroGrafix existed which covered work ongoing at the NIH."  *Id.*  According to plaintiffs, these communications are "applicable to this case so that an effective 10-year statute of limitation has resulted.  For these reasons, claims dating back at least to 2009 are actionable in this matter."  *Id.* at 21.  The government argues the email communications are insufficient to satisfy the requirements of 28 U.S.C. § 286 to trigger the tolling of the six-year statute of limitations.  *See* Reply to Opp'n to MTD at 5–7.

#### i.   Emails to Dr. Peter Basser

##### a.   April 2009

In order for this Court to find a previously submitted administrative claim necessary to toll the statute of limitations, plaintiffs must show, at a minimum:  a written claim notifying the correct agency; recitation of the underlying facts of a claim against the government; and a sum certain for damages.  *See Leonardo*, 55 Fed. Cl. at 352–53.  Plaintiffs description of the April 2009 email to Dr. Basser is misleading.  The April 2009 email to Dr. Basser merely discusses, in general terms, the technology related to the invention disclosed in the '360 patent and an article written by Dr. Filler.  *See* Opp'n to MTD, Ex. U (28 April 2009 email from Dr. Filler to Dr. Basser discussing a scholarly article authored by Dr. Filler).  The April 2009 email does not

make any reference to the government's alleged infringement of the '360 patent.  *See id.*  In fact, the April 2009 email does not make any reference to the '360 patent.  As the government states: "[t]he email does not mention infringement, does not seek compensation and does not identify the '360 patent."  Reply to Opp'n to MTD at 5.

In *Leonardo*, the plaintiff was an artist with an exhibit stored in a governmental facility following display at a government exhibition in 1990.  55 Fed. Cl. at 345–46.  In 1996, plaintiff's artwork was destroyed during renovations to the facility where the artwork was stored.  *Id.* at 346.  In 1997, "plaintiff filed a tort claim with the U.S. Department of Justice for the damage to her artwork."  *Id.*  Following dismissal of plaintiff's administrative claim in early 2001, plaintiff filed suit in the Court of Federal Claims alleging "breach of contract and copyright infringement."  *Id.*  As the statute of limitations for copyright claims under § 1498(b) is three years, the plaintiff sought to toll the applicable statute of limitations by relying on submission of the administrative claim to the Department of Justice.  *Id.* at 351.

Similar to the present case, in *Leonardo*, there was no formal regulation defining the submission of an administrative claim.  *Leonardo*, 55 Fed. Cl. at 352 ("[T]he Department of Justice has not issued regulations to define the term 'claim' or to direct the filing of a claimant's administrative copyright infringement claim to any specific office.").  This Court therefore reviewed the specifics of the submission to determine whether it was "sufficiently detailed to afford the Government a realistic opportunity to consider and settle the claim."  *Id.* at 352 (quoting *Custer*, 622 F.2d at 558).  The plaintiff's submission qualified as a written administrative claim because it "notified the correct agency . . . of the underlying facts of a claim pending against the government and stated a sum certain for the damages."  *Id.* at 352–53.

Here, plaintiffs alleged submission of an administrative claim fails to provide "sufficient[] detail to afford the Government a realistic opportunity to consider and settle the claim."  *Id.* at 352.  The Court need not determine whether a submission to Dr. Basser, in his role at NIH, was sufficient to notify the correct agency because the submission itself is facially deficient.  There is no recitation of the underlying facts of the claim, no attachment or citation of the patent, and there is no sum certain for damages discussed.  Without referencing the '360 patent or discussing infringement in any way, the Government was not afforded any opportunity to consider the claim, let alone explore settlement possibilities.  For these reasons, the April 2009 email to Dr. Basser does not constitute an administrative claim sufficient to toll the statute of limitations under 35 U.S.C. § 286.

### b.  October 2009

Next, the Court turns to the October 2009 email to Dr. Basser.  There is no content in the body of the October 2009 email.  *See* Opp'n to MTD, Ex. W (6 October 2009 email from Dr. Filler to Dr. Basser containing a .pdf attachment with no content in the body of the message).  The email contains the title, "For your interest," in addition to an attachment which appears to be an article authored by Dr. Filler.  *See id.* (showing an email attachment entitled "2009_MRN-DTI_5000_Neurosurg.pdf").

Similar to the April 2009 email, there is no discussion of the underlying facts of the government's alleged infringement of the '360 patent.  In fact, there is no discussion at all:  the '360 patent is not attached to the email, nor is it even referenced at all.  Additionally, there is no sum certain stated.  The October 2009 email did not afford the government any opportunity to consider the claim or explore settlement possibilities.  Accordingly, the October 2009 email does not constitute an administrative claim sufficient to toll the statute of limitations sunder 35 U.S.C. § 286.

###### ii.       December 2009 Email to Dr. Elizabeth Nabel

The December 2009 email, unlike the April and October 2009 emails, does discuss infringement of the '360 patent.  The December 2009 email is titled, "Patent infringement risk to BWH with new IMRIS AMIGO MRI installation - US Patent 5,560,360."  Opp'n to MTD, Ex. V (18 December 2009 email from Dr. Basser to Dr. Nabel discussing possible infringement of the '360 patent by the Brigham and Women's Hospital).  In the body of the December 2009 email, Dr. Filler provides a more detailed recitation of the facts regarding infringement.  For example, the specific instrument alleged to infringe is identified both by the manufacturer (IMRIS) and the allegedly infringing process (DTI).  *See id.*  Dr. Filler then references the chain of ownership of the '360 patent, indicating NeuroGrafix as the exclusive licensee from the University of Washington and further referencing the need for the recipients of the email to take a license.  *Id.*

Regardless of the content, the December 2009 email does not adequately notify the relevant government agency.  The only tenuous link to the government is the email address used for Dr. Nabel, nabele@nih.gov, which contains a government domain (@nih.gov).  *See id.*  Despite using an NIH-domain email address, both the subject line and the body of the December 2009 email are addressed to Dr. Elizabeth Nabel in her role as the future president of Brigham and Women's Hospital ("BWH"); not in her capacity at the NIH.  *Id.*  The other individual to whom the email is addressed, Gary Gottlieb, is also referenced in regard to his position as the then-current president of BWH.  *Id.*

There is no mention of the NIH or any other government agency in the December 2009 email.  The body of the email does not discuss any facts related to the government's alleged infringement.  *Id.*  In fact, the body of the email suggests it was not intended for alerting the relevant government agency of any alleged infringement.  The allegedly infringing product is said to have been "purchase[d] recently for several million dollars and announced by [BWH]."  *Id.*  BWH is then discussed in conjunction with Harvard Medical School and Harvard University; nowhere in the email is the government, either generally or with regard to a particular agency, implicated in the infringement discussions.

A plain reading of the December 2009 email does not provide notice to any government agency regarding alleged infringement of the '360 patent.  Because the December 2009 email does not notify the correct agency, nor discuss the underlying facts of a claim against the government, it is insufficient to constitute an administrative claim sufficient to toll the statute of limitations under 35 U.S.C. § 286.

Claims for patent infringement against the government have a six-year statute of limitations. Plaintiffs cannot establish submission of an administrative claim sufficient to toll the limitations period under 35 U.S.C. § 286. Infringement claims arising prior to 31 January 2013 are thus barred by the six-year statute of limitations. 35 U.S.C. § 286.[8]

### 6. The Court Lacks Subject Matter Jurisdiction Over Plaintiffs Claims

Plaintiffs are barred from enforcing claims for patent infringement accruing after 1 October 2013, the expiration date of the '360 patent. *Kearns*, 32 F.3d at 1550 ("Because the rights flowing from a patent exist only for the term of the patent, there can be no infringement once the patent expires."). In *NeuroGrafix I*, this Court held neither the 1994 License nor the 1998 License transferred the right to enforce the '360 patent against the government to plaintiffs. *NeuroGrafix I*, 111 Fed. Cl. at 507–08 ("Whatever the extent to which [the Washington Research Foundation] has a right to sue the United States . . . [the Washington Research Foundation] did not pass that right on to [NeuroGrafix]."). Plaintiffs in the present action are collaterally estopped from arguing whether any of the 1994 License, the 1998 License, or the 2012 Amendment transferred the right to enforce the '360 patent against the government. *Banner*, 238 F.3d at 1354 ("The doctrine of collateral estoppel . . . serves to bar the revisiting of issues that have already been litigated by the same parties or their privies based on the same cause of action.").

The right to enforce the '360 patent against the government was not transferred to plaintiffs until execution of the December 2013 Assignments. First Am. Compl. ¶ 23 ("In December of 2013, all rights as to all inventors, including a retroactive right to sue and the right to sue governments, were assigned from the State of Washington to the Washington Research Foundation. The [Washington Research Foundation] assigned all rights to NeuroGrafix . . . [and] NeuroGrafix assigned all rights to [Dr. Filler]."). The Assignment of Claims Act bars plaintiffs from asserting the '360 patent against the government for claims which accrued to another party. *3rd Eye Surveillance*, 133 Fed. Cl. at 277 ("Assignments of patent rights are subject to the Assignment of Claims Act, and voluntary assignments of patent claims are ineffective against the government unless they qualify for one of the[] judicial-recognized exceptions or otherwise do not run afoul of the purposes of the Act."). Plaintiffs cannot satisfy any of the recognized exceptions to avoid application of the Assignment of Claims Act. The Court therefore lacks subject matter jurisdiction to adjudicate plaintiffs' claims pursuant to 28 U.S.C. § 1498. The government's motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) is granted.

### IV. Plaintiffs' Motion for Declaratory Judgment to Declare Patent Assignment Void *Ab Initio*

---

[8] Should plaintiffs cure the jurisdictional deficiencies discussed *supra*, for example by joining the necessary party who possessed the right to enforce the '360 patent against the government in this action during the life of the patent, any such claims for infringement accruing prior to 31 January 2013 are likely barred by the statute of limitations pursuant to 28 U.S.C. § 2501.

### a.   Standard of Review for this Court's Ability to Render a Declaratory Judgment

The Court of Federal Claims is a court of narrow jurisdiction "limited to money claims against the United States Government." *United States v. King*, 395 U.S. 1, 2–3 (1969) (discussing the jurisdiction of this Court's predecessor court, the Court of Claims).  This Court's jurisdiction is defined in the Tucker Act:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).  Interpretation of the Tucker Act "require[s] that a plaintiff seeking to invoke the court's jurisdiction must present a claim for 'actual, presently due money damages from the United States.'" *Natl. Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998) (quoting *King*, 395 U.S. at 3).  The Tucker Act does not generally provide plaintiffs with a vehicle for pursuing equitable remedies:  "there is no provision giving the Court of Federal Claims Jurisdiction to grant equitable relief when it is unrelated to a claim for monetary relief pending before the court."  *Id.* (citing *King*, 395 U.S. at 4).

### b.   Discussion

#### 1.   Parties Arguments

Plaintiffs in the present case "seek a Declaratory Judgment by this Court to find that the Patent Assignment executed by Plaintiff Aaron G. Filler on June 14, 1993 – which assigned rights in the ['360 patent] - is Void Ab Initio." ("the 1993 Assignment").  Mot. for Decl. J. at 4; *see also* First Am. Compl. ¶ 16.  Plaintiffs seek a declaration voiding the 1993 Assignment *ab initio* not to satisfy standing, but rather in an attempt to avoid application of the Assignment of Claims Act.  "Should this Court deny this Motion for a Declaratory Judgment of *Void Ab Initio* status for Filler's 1993 assignment of his right as an inventor in the technology of the ['360 patent] to the University of Washington, then Filler's standing is little affected at present."  *Id.* at 5.  With the 1993 Assignment voided, plaintiffs argue "the reversion right to [NeuroGrafix-Sole Proprietorship] became the operative reversion right when all conditions of the [Washington Research Foundation] reversion rights were resolved in late 2012."  *Id.*  Under this theory, the 2012 reversion rights, rather than the December 2013 Assignments, become the operative documents establishing plaintiffs right to enforce the '360 patent against the government

Plaintiffs offer two theories for why the Court shoulder render the 1993 Assignment void *ab initio*.  First, plaintiffs argue the 1993 Assignment is "void as against public policy of the State of Washington under a 1979 statute which was in force at the time of the assignment and is still in force." *Id.* at 14.  Second, plaintiffs argue the 1993 Assignment is void "due to fraud in the factum. . . . The [1993 Assignment] was identified to Filler as mandatory when in fact it was not." *Id.* at 16.

The government argues "the Court lacks general power to grant such relief." Opp'n to Mot. for Decl. J. at 3. "[T]he Court of Federal Claims lacks general authority to entertain requests for declaratory judgments." *Id.* at 6. According to the government, plaintiffs "must first obtain a declaration that the 1993 Assignment was void *ab initio* from a state court." *Id.* at 7. Lastly, the government notes "any declaration of rights by the Court would require participation of the University of Washington, the counterparty on the assignment. But the Court lacks jurisdiction over such claims and over the University, which has no direct relationship with the government." *Id.* at 8.[9]

## 2. Analysis

In patent infringement suits, "[f]ederal question jurisdiction must exist at the time the complaint is filed for a federal court to exercise authority over the case." *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1577 (Fed. Cir. 1997). Seeking a declaratory judgment finding a licensing agreement void *ab initio* is equivalent to asking the court to rescind the contract "as if it never existed." *See Dow Chemical Co. v. United States*, 226 F.3d 1334, 1345 (Fed. Cir. 2000). "It is an equitable doctrine which is grounded on mutual mistake, fraud, or illegality in the formation of a contract. . . . Because rescission is essentially an equitable remedy, it will not ordinarily be invoked where money damages . . . will adequately compensate a party to the contract." *Id.* When ownership rights of a patent resulting from assignment(s) of ownership are disputed, "unless the assignment may be declared null and void by operation of law—either through a forfeiture provision present in the agreement or under a provision of applicable state law—an assigner suing for infringement must first affirmatively seek equitable relief from a court to rescind or cancel the assignment." *Jim Arnold Corp.*, 109 F.3d at 1577. As "an action to rescind or cancel an assignment is a state-law based claim, . . . it is to a state court that plaintiffs must look in seeking a forfeiture of the license." *Id.*

As plaintiff recognizes, "federal jurisdiction in a Declaratory Judgment action arises only when the federal court already has jurisdiction for some other reason." Mot. for Decl. J. at 6. This result stems from Federal Circuit case law generally holding that "the Declaratory Judgment Act is not an independent basis for subject matter jurisdiction." *Prasco, LLC v. Medicis Pharma. Corp.*, 537 F.3d 1329, 1335 (Fed. Cir. 2008) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950)).

---

[9] As previously discussed, the Court of Federal Claims lacks jurisdiction over claims seeking relief against parties other than the United States. *See Sherwood*, 312 U.S. at 588. Any attempt by plaintiffs to involve the University of Washington in a contract-related dispute before this Court would result in a dispute purely between private parties. The University of Washington, as a public institution run by the state of Washington, does not take the University outside the definition of a "private party" as used to establish the jurisdiction of this Court. *See O'Diah v. United States*, 722 Fed. App'x 1001, 1003 (Fed. Cir. 2018) ("To the extent that [the plaintiff's] complaint seeks relief against defendants other than the United States, including state or local entities and private individuals and corporations, the [Court of Federal Claims] correctly dismissed those claims for lack of subject-matter jurisdiction."); *Lawton v. United States*, 621 Fed. App'x 671, 672 (Fed. Cir. 2015) (mem.) (citing *Sherwood*, 312 U.S. at 588) ("The Court of Federal Claims lacks jurisdiction over states, state officials, and state agencies.").

The Court of Federal Claims, however, possesses an even narrower ability to grant equitable relief in the form of a declaratory judgment.  The Court of Federal Claims is a court of limited jurisdiction, restricted only to money-mandating claims for relief from the federal government.  *See Natl. Air Traffic Controllers Ass'n*, 160 F.3d at 716–17 (quoting *King*, 395 U.S. at 3) ("[The Tucker Act] has been interpreted to require that a plaintiff seeking to invoke the court's jurisdiction must present a claim for 'actual, presently due money damages from the United States.'").  The Court need not reach whether it may grant a declaratory judgment award rendering the 1993 Assignment void *ab initio* as an ancillary matter to plaintiffs' claims for patent infringement.  Plaintiffs cannot satisfy the requirements for subject matter jurisdiction of a money-mandating claim as they cannot show they possessed the right to enforce the '360 patent against the government during the enforceable life of the patent.

This Court may not entertain plaintiffs' claim for a declaratory judgment action absent a corresponding already-valid money mandating claim.  An action for declaratory judgment cannot, by itself, maintain jurisdiction in this Court.  *See id.* ("The Court of Federal Claims has never been granted general authority to issue declaratory judgments, and to hold that the Court of Federal Claims may issue a declaratory judgment in this case, unrelated to any money claim pending before it, would effectively override Congress's decision not to make the Declaratory Judgment Act applicable to the Court of Federal Claims.").  "It is not enough that the court's decision may affect the disposition of a monetary claim pending elsewhere, or that the court's [declaratory judgement] decision will ultimately enable the plaintiff to receive money from the government."  *Id.* (citing *King*, 395 U.S. at 4).  Thus, plaintiffs may not use a declaratory judgment action as the vehicle by which to satisfy the requirements of subject matter jurisdiction in this Court.  Accordingly, plaintiffs' motion for declaratory judgment must be denied.

## V.   Conclusion

This Court does not have subject matter jurisdiction over plaintiffs' claims for patent infringement of the '360 patent against the government.  Accordingly, the Court hereby **GRANTS** the government's motion to dismiss pursuant to RCFC 12(b)(1).  As a result, this Court further lacks subject matter jurisdiction to maintain an action for declaratory judgment absent jurisdiction over plaintiffs' money mandating claim for patent infringement from which the declaratory judgment action arises.  Plaintiffs' motion for declaratory judgment is **DENIED**.  The Clerk is directed to **DISMISS** the case.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge