# In the United States Court of Federal Claims

No. 19-173
(Filed: 9 November 2020)
NOT FOR PUBLICATION

```
*************************************
AARON G. FILLER, et al.,              *
                                      *
            Plaintiffs,               *   Patent Infringement; Motion for
                                      *   Reconsideration; RCFC 59(a)(1)(A).
                                      *
v.                                    *
                                      *
THE UNITED STATES,                    *
                                      *
            Defendant.                *
                                      *
*************************************
```

*Aaron G. Filler*, Tensor Law PC, of Santa Monica, CA, for plaintiffs.[1]

*Gary L. Hausken*, Director, Commercial Litigation Branch, Civil Division, Department of Justice, with whom was *Joseph H. Hunt*, Assistant Attorney General, both of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE**, **Judge**.

On 8 May 2020, the Court granted the government's motion to dismiss plaintiffs' patent infringement claims for lack of jurisdiction. *See Filler v. United States*, 148 Fed. Cl. 123 (2020) ("*Filler*"). Plaintiffs filed a motion requesting reconsideration of the order to dismiss on 8 June 2020. *See* Mot. for Recons. of Order Granting Def.'s Mot. to Dismiss and Therethrough Rev'l of J. Under Rule 59(a)(1)(A), ECF No. 48 ("Mot. for Recons."). For the following reasons, the Court **DENIES** plaintiffs' motion for reconsideration.

**I.  Procedural and Factual History**[2]

The Court previously found it lacked subject-matter jurisdiction over plaintiffs' complaint alleging patent infringement by the government. *See generally Filler*. Therein, the

---

[1] Attorney and doctor Aaron G. Filler, while representing himself as a named plaintiff, also serves as counsel of record for the remaining plaintiffs (all of which are business entities associated with Dr. Filler) through his role as an attorney with Tensor Law P.C. Additionally, Dr. Filler is one of the named inventors on the patent at issue in this case.

[2] For a complete discussion of all relevant facts regarding plaintiff's claims, see the 8 May 2020 Order dismissing the case. *See Filler v. United States*, 148 Fed.Cl. 123, 128–130 (2020).

Court made three findings regarding various licensing agreements relevant to plaintiffs' claims.[3] First, the Court found plaintiffs are collaterally estopped from relitigating interpretation of the 23 March 1994 license from the University of Washington to the Washington Research Foundation ("WRF") ("the 1994 License"), the 29 December 1998 license from WRF to NeuroGrafix ("the 29 Dec. License"), and the 14 June 2012 amendment to the 29 Dec. License ("the 2012 Amendment").[4] *See id.* at 137-139. The Court reasoned each of the relevant portions of these agreements were previously interpreted by this Court in *NeuroGrafix v. United States*, 111 Fed Cl. 501 (2013) ("*NeuroGrafix I*"). *Id.* Second, the Court found "the Assignment of Claims Act bars plaintiffs from receiving an enforceable right to recover for infringement accruing to another party prior to" the December 2013 assignments. *Id.* at 142. And third, the Court found Dr. Filler's emails to Dr. Peter Basser and Dr. Elizabeth Nagel did not toll the statute of limitations under 28 U.S.C. § 286. *See id.* at 142-144. For these reasons, the Court found the relevant licensing agreements failed to transfer plaintiffs the right to enforce the '360 patent against the government. *See id.* at 147.

Plaintiffs filed a motion for reconsideration 8 June 2020. *See* Mot. for Recons. On 9 June 2020, the Court issued a scheduling order permitting the government to file a response to plaintiffs' motion for reconsideration. *See* Order, ECF No. 49. The government filed a response on 24 June 2020. *See* Resp. of the United States to Pls.' Req. for Recons. of Dismissal for Lack of Jurisdiction, ECF No. 50 ("Resp. to Mot. for Recons."). Plaintiffs filed a reply on 2 July 2020. *See* Reply to Def.'s Opposition to Mot. for Recons. of Order Granting the Mot. to Dismiss and Therethrough Rev'l of J. Under Rule 59(a)(1)(A), ECF No. 52 ("Pls.' Reply"). There is no provision in the Court's rules permitting plaintiffs to file a reply brief in support of their motion for reconsideration without leave of Court. The government, however, has not sought to strike plaintiffs' reply since its filing. Accordingly, despite plaintiffs' failure to seek leave of the Court to file such a reply, the Court treats plaintiffs' filing as a motion for leave to file a reply brief and accepts plaintiffs' reply brief as if properly filed.

Plaintiffs raise three issues in their motion for reconsideration: (1) whether the Court determined the standing of the correct party; (2) whether the Court considered the correct licensing agreements; and (3) whether the Court correctly applied the doctrine of collateral estoppel. Mot. for Recons. at 2–3. Each of plaintiffs' three arguments are premised on a set of intervening licenses transferring rights in the '360 patent prior to the 29 Dec. License: a 7 December 1998 license from WRF to NeuroGrafix-Sole Proprietorship ("the 7 Dec. License"); and a 21 December 1998 license from NeuroGrafix-Sole Proprietorship to NeuroGrafix ("the 21 Dec. License"). *Id.*

## II.   Standard of Review for Motion for Reconsideration

---

[3] The Court also found it lacked subject-matter jurisdiction to consider plaintiffs' request for a declaratory judgment finding a previously executed patent assignment void *ab initio*. The Court does not address this issue further as plaintiffs do not request reconsideration of this finding. *See Filler* at 145–46; Mot. for Recons.

[4] In *Filler*, the Court referred to the 29 December 1998 licensing agreement between WRF and NeuroGrafix as "the 1998 License." As the Court now addresses a series of licensing agreements also executed in 1998, the Court will refer to each of the various 1998 licensing agreements by their date of execution. Unless otherwise indicated, all references to the 29 Dec. License refer to the license as amended (i.e., the 2012 Amendment).

The Court may grant a motion for reconsideration pursuant to Rule 59(a)(1) of the Rules of the Court of Federal Claims ("RCFC"): "(A) for any reason for which a new trial has heretofore been granted in an action at law in federal court; [or] (B) for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." RCFC 59(a)(1)(A)-(B). "Motions for reconsideration must be supported 'by a showing of extraordinary circumstances which justify relief.'" *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (quoting *Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298, 300 (1999), *aff'd*, 250 F.3d 762 (Fed. Cir. 2000) (per curiam)). "Under [RCFC] 59(a)(1), a court, in its discretion, 'may grant a motion for reconsideration when there has been an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice.'" *Biery v. United States*, 818 F.3d 704, 711 (Fed. Cir. 2016) (quoting *Young v. United States*, 94 Fed. Cl. 671, 674 (2010)). "It is not sufficient for plaintiffs to reassert the same arguments they made in earlier proceedings, nor can plaintiffs raise new arguments that could have been made earlier." *Lee v. United States*, 130 Fed. Cl. 243, 252 (2017), *aff'd*, 895 F.3d 1363 (Fed. Cir. 2018) (citing *Freeman v. United States*, No. 01-39L, 2016 WL 943859 (Fed. Cl. Mar. 1, 2016), *aff'd*, 875 F.3d 623 (Fed. Cir. 2017); *Stueve Bros. Farms, LLC v. United States*, 107 Fed. Cl. 469, 475 (2012), *aff'd*, 737 F.3d 750 (Fed. Cir. 2013)); *see also Bluebonnet Sav. Bank, F.S.B. v. United States*, 466 F.3d 1349, 1361 (Fed. Cir. 2006) ("[A]n argument made for the first time in a motion for reconsideration comes too late.").

Neither plaintiffs nor the government discuss the standard of RCFC 59 in their briefing on reconsideration, nor do they cite any precedent applying the rule. Plaintiffs also do not point to any change in the controlling law or newly discovered evidence. Although plaintiffs do not specifically state under which prong of RCFC 59 they seek reconsideration, the Court interprets plaintiffs' motion for reconsideration to be alleging a mistake of factual or legal error leading to manifest injustice based on the following statement: "The Court has grievously confused parties and contracts in reaching its [*Filler* decision]. There are three contracts at issue here only one of which is relevant to this case, but the Court's ruling reveals that unmistakably—it only considered the two irrelevant contracts and thereby misunderstood the basis of standing and mis-applied collateral estoppel[.]" Mot. for Recons. at 2.

### III. Standing to Assert the '360 Patent

#### a. Parties Arguments

Plaintiffs argue only the standing of Aaron G. Filler, as an individual (hereafter "Filler" or "Dr. Filler" shall refer to Aaron G. Filler individually), is relevant to the Court's determination: "Standing should be determined based on the party or parties filing suit on the day the suit was filed. This lawsuit was filed with just one Plaintiff—Aaron G. Filler, an individual." Mot. for Recons. at 3.[5] "The fact that other parties were joined later through a Motion for Joinder is wholly irrelevant." *Id.* Plaintiffs assert Filler executed the 7 Dec. License

---

[5] In addition to serving as counsel for each of the plaintiffs named in this action, Filler is further affiliated with each of these parties in a business relationship. Filler either was, or currently is: the CEO of NeuroGrafix; the Medical Director of Neurography Institute Medical Associates ("NIMA"); and the President and CEO of Image-Based Surgicenter Corporation ("IBS"). *Filler* at 139.

with WRF on 7 December 1998 which establishes his standing to allege infringement against the government.  *Id.* at 4.

The government notes "[p]laintiffs raise a new issue of standing in the *Reconsideration Motion*."  Resp. to Mot. for Recons. at 2.  The government argues plaintiffs' allegations that the Court's 8 May Order addressed the wrong parties "is an incorrect proposition."  Resp. to Mot. for Recons. at 9.  The government notes "[t]he Court's discussion of 'ownership' in [the 8 May Order] was in the context of the Court's *jurisdiction* under 28 U.S.C. § 1498 (permitting suits only by the owner of a patent), not to standing."  *Id.*  According to the government, "the Court necessarily addressed the claims of all the parties, including those that had been joined, to determine if any of the plaintiffs were an 'owner.'"  *Id.*  The government further notes while it "agrees that the Court must determine Dr. Filler's standing to bring this suit, and the reason for dismissal will change, the outcome remains the same."  *Id.* at 2.  According to the government, "the '360 Patent was assigned to the University of Washington . . . and licensed to [WRF]."  *Id.* at 3.  The government, after analyzing a series of previous district court litigations involving the '360 patent as well as the various "exclusive" licensing agreements, concludes "Dr. Filler has not, and cannot, establish standing.  During the relevant period of January 31 to October 1, 2013, there existed two 'exclusive license' *and* a third party—WRF—owned the right to sue the United States under both licenses."  *See id.* at 4–9.

### b. Whether Dr. Filler, as the Original Plaintiff of Record, had Standing to Assert the '360 Patent

"Standing to sue is a threshold requirement in every federal action."  *Sicom Sys., Ltd. v. Agilent Technologies, Inc.*, 427 F.3d 971, 975 (Fed. Cir. 2005) (internal citation omitted).  "Article III standing, like other bases of jurisdiction, must be present at the inception of the lawsuit."  *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003) (internal citation omitted).  "The Court of Federal Claims, though an Article I court, applies the same standing requirements enforced by other federal courts created under Article III."  *Anderson v. United States*, 344 F.3d 1343, 1359 n.1 (Fed. Cir. 2003) (internal citation omitted).  "Pursuant to Article III, 'standing . . . is jurisdictional and not subject to waiver.'"  *Media Techs. Licensing*, 334 F.3d at 1370 (quoting *Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996)).  In a patent infringement action, standing is satisfied by "not only the patentee to whom the patent was issued but also the successors in title to the patentee."  *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000) (internal citation omitted).  The Federal Circuit thus recognizes "an exclusive, territorial licensee is equivalent to an assignment and may therefore confer standing upon the licensee to sue for patent infringement."  *Id.*

The Court did not specifically address Dr. Filler's standing to assert the '360 patent in the 8 May 2020 Order.  Rather, given the limited jurisdiction of the Court of Federal Claims and this Court's previous decision in *NeuroGrafix I*, the Court reviewed the various licensing agreements involving the '360 patent from a jurisdictional perspective to determine whether any of these agreements transferred the right to assert the '360 patent against the government to any of the plaintiffs in this case, thus giving rise to a cause of action pursuant to 28 U.S.C. § 1498.  *See generally Filler*.  Absent subject matter jurisdiction under § 1498 over any claims in the case, the Court dismissed plaintiffs' complaint.  *Id.* at 147.  Whether plaintiffs satisfied Article III

standing is a determination which necessarily follows from an analysis of the same facts and allegations analyzed in the Court's jurisdictional analysis under § 1498.

Plaintiffs now raise the issue of standing in its motion for reconsideration, arguing the Court's consideration of this "threshold issue" will somehow supplant the finding of a lack of jurisdiction under § 1498. As standing "must be present at the inception of the lawsuit," the Court therefore considers the standing of Dr. Filler. *Media Techs. Licensing*, 334 F.3d at 1370. A determination of Dr. Filler's standing, however, necessarily requires an analysis of the various licensing agreements underlying this case. "The Court may look to both the substance of the rights granted as well as the intention of the parties." *NeuroGrafix I*, 111 Fed. Cl. at 505 (citing *Mentor H/S Inc. v. Medical Device Alliance Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001)). As Dr. Filler's other grounds for reconsideration similarly require analysis of the various 1998 licensing agreements, the Court engages in the necessary analysis of these agreements first, returning to a determination of Dr. Filler's standing once the necessary facts are established and analyzed.

### IV. Whether the Court's 8 May 2020 Order Dismissing Plaintiff's Complaint Addressed the Correct Licensing Agreements

#### a. Parties' Arguments

According to plaintiffs, the 29 Dec. License which this Court interpreted in *NeuroGrafix I*, and refused to allow plaintiffs to relitigate in this case, was between WRF and NeuroGrafix, not WRF and Filler. Mot. for Recons. at 3. Plaintiffs characterize the 29 Dec. License as an "encumbrance [that] was imposed to enforce repayments to WRF due to loan notes of hundreds of thousands of dollars of costs which WRF incurred in the filing and prosecution of the patent." *Id.* at 4. The 29 Dec. License allegedly expired sometime after the filing of *NeuroGrafix I* as "the loan notes were paid off and the contract expired through maturation and termination of all duties that might trigger reversion of rights to WRF." *Id.* Plaintiffs thus assert the 7 Dec. License became operative again, and "with no assignment necessary, Filler was the sole exclusive licensee and had standing to sue the United States based on the terms of the contract." *Id.* Plaintiffs further argue because Filler was not a party in *NeuroGrafix I*, "he cannot have had a full and fair opportunity to litigate the issue." *Id.* at 5. Similarly, plaintiffs argue Filler therefore has no ability to appeal the decision in *NeuroGrafix I*. *Id.* at 6. If the Court finds otherwise, plaintiffs allege the Court would "find an alter ego relationship" and "void[] the application of the Assignment of Claims [sic] Act as to the 2013 transfers."[6] *Id.*

Plaintiffs next argue *NeuroGrafix I* and the present case were based upon two separate exclusive licenses: *NeuroGrafix I* concerned an exclusive license from WRF to NeuroGrafix, whereas the present case "was based on an entirely different contract between the Washington

---

[6] In plaintiffs' reply, they assert a new argument that Filler had standing because the government had not yet asserted the Assignment of Claims Act, or, in the alternative, "[t]he [Assignment of Claims Act] is irrelevant because, through the December 7, 1998 agreement Filler gained his rights without assignment." Pls.' Reply at 13. The Court does not address this argument as it was not raised in plaintiffs' briefing before dismissal or in their motion for reconsideration. *See Bluebonnet Sav. Bank*, 466 F.3d at 1361 ("[A]n argument made for the first time in a motion for reconsideration comes too late.").

- 5 -

Research Foundation and Aaron G. Filler, an individual."[7] Mot. for Recons. at 6. Plaintiffs argue because these agreements were between different parties, collateral estoppel cannot apply. *Id.* at 6–7. Plaintiffs also contend "[t]he purpose of the 2013 assignments was to resolve problems in United States District Court." *Id.* at 7. Plaintiffs agree the 2012 Amendment was to the 29 Dec. License, but state this amendment has no effect on the present case because, again, the proper 1998 licensing agreement to be addressed was the 7 Dec. License between WRF and Filler. *Id.* at 7–8.

Regarding plaintiffs' assertion the Court considered the wrong agreement in the 8 May Order, the government argues "both the December 7, 1998 Agreement and 2012 Restated Agreement were in effect on January 31, 2013. Neither agreement controls over the other." Resp. to Mot. for Recons. at 9–10. The government notes "Plaintiffs argue that the 2012 Restated Agreement expired at an unstated date," but "nothing in the promissory note nor the license agreement supports Plaintiffs' theory." *Id.* at 10. Lastly, the government argues while "Plaintiffs further suggest that somehow the December 7, 1998 Agreement had been in hibernation during the December 29, 1998 Agreement and 2012 Restated Agreement but came back to life with the expiration of those two agreements," such an argument "finds no support in the documents or the history of the many cases that were brought pursuant to those agreements." *Id.*

> **b. Whether Plaintiffs Properly Alleged Expiration of the 29 Dec. License in the Original Briefing on the Government's Motion to Dismiss**

In the initial briefing on the government's motion to dismiss, as well as during oral argument, plaintiffs referenced the alleged expiration of the 29 Dec. License. *See* Opp'n to Mot. to Dismiss at 15, ECF No. 28 ("Opp'n to MTD"); Tr. at 67:10–16, ECF No. 45. Yet plaintiffs seemingly could not agree on either the reason for, or the date on which, the 29 Dec. License expired, offering at least three separate accounts of the alleged "expiration:" 15 June 2012; 1 October 2012; and in December of 2012. *See* Opp'n to MTD at 15 ("[T]he reversionary rights in the original [7 Dec. License] were superseded by the abandonment of any reversionary right owed to WRF upon execution of the Amended WRF to [NeuroGrafix] ELA on June 15, 2012"); First Am. Compl. for 28 USC § 1498 Taking at 9, ECF No. 26 ("First Am. Compl.") ("All of [the promissory notes between the WRF and NeuroGrafix] were subsequently fully paid and all reversionary rights expired on October 1, 2012 because all had a 12 month notice period . . . absent the reversionary rights which elapsed by operation of law in December of 2012, [the 29 Dec. License] is superseded by the superior earlier [21 Dec. License]."); Tr. at 67:10–16 ("But once [the 29 Dec. License] expired, which I pointed out was a year before the end of the patent, the October of 2012, once that expired, . . . at that point, we would revert to the [7 Dec. License]. There's no longer an intervening WRF license because their reversionary right is expired.").

---

[7] In their reply brief, plaintiffs argue, without any citation to authority, the government "asserts that perhaps the contract does not exist," referring to the 7 Dec. License. Pls.' Reply at 6. The government explicitly acknowledges the existence of the 7 Dec. License in their response. Resp. to Mot. for Recons. at 5 ("It is undisputed that WRF entered a license agreement with Dr. Filler on December 7, 1998."). Accordingly, the Court does not address plaintiffs' baseless assertion.

Prior to dismissal, the government did not brief the issue of whether the 29 Dec. License expired before expiration of the '360 patent.  *See* Mot. of the United States to Dismiss for Lack of Jurisdiction, ECF No. 27 ("Gov't MTD");  Reply of the United States to Pls.' Opp'n to the Mot. to Dismiss for Lack of Jurisdiction, ECF No. 30 ("Gov't Reply").  The government did not use the term "expire" in reference to any of the assignments or licensing agreements, but rather only to discuss the expiration of the patent itself.  *See* Gov't MTD;  Gov't Reply.  The government's motion to dismiss relied on this court's decision in *NeuroGrafix I*, which found the 29 Dec. License did not transfer plaintiffs the right to enforce the '360 patent against the government.  Gov't MTD at 9.  The government thus argued plaintiffs did not receive the necessary right to enforce the '360 patent against the government until the December 2013 assignments, which was after the '360 patent expired.  *See* Gov't MTD at 7.  When plaintiffs raised a series of disconnected arguments regarding various licensing agreements from 1998 in their response brief in an attempt to show the transfer of the necessary rights prior to expiration of the '360 patent, *see* Opp'n to Mot. to Dismiss at 3, ECF No. 28, the government first raised the issue of collateral estoppel.  Gov't Reply at 12.

To the extent plaintiffs attempted to argue the relevance of the 7 Dec. License prior to dismissal, the recipient of the "exclusive" 7 Dec. License, NeuroGrafix-Sole Proprietorship, licensed its rights to NeuroGrafix via the 21 Dec. License.  The 29 Dec. License, directly from WRF to NeuroGrafix, appeared to be a confirmatory license supplanting the two previous "exclusive" licenses, pursuant to the express language of the 21 Dec. License:  "WRF shall be entitled to supplement and replace this agreement with a confirmatory Agreement with the same terms, directly between WRF and its planned successor, NeuroGrafix."  7 Dec. License at 4.  As plaintiffs did not articulate any consistent set of facts or a plausible explanation for the expiration of the 29 Dec. 1998 License, the Court proceeded according to the last of the three executed "exclusive" licenses:  the 29 Dec. License.  Although the Court did not make this point "as explicit as plaintiff[s] do[] in [their] motion for reconsideration, no error was made."  *Sec. Point Holdings, Inc. v. United States*, Case No. 11-268, 2020 WL 4197752, at *5 (Fed. Cl. July 17, 2020) (finding no legal error where plaintiff merely disagreed with the court as to "the legal significance of its agreements" and such disagreement was "not a basis for reconsideration"); *see also Lee*, 130 Fed. Cl. at 252, *aff'd*, 875 F.3d 623 (Fed. Cir. 2017) ("It is not sufficient for plaintiffs to reassert the same arguments they made in earlier proceedings").

Instead, the Court proceeded according to plaintiffs' counsel's characterization of this Court's alleged error in interpreting the 29 Dec. License in *NeuroGrafix I*.  "So our argument is that this was made by a—it is a gross error, a mistake by Judge Damich, and I'm going to first show you what we say is the mistake and come back and show why when you look at the mistake, collateral estoppel favors us, if anything."  Tr. at 25:5–10.  Because plaintiffs' inconsistent presentation of facts and argument focused on the Court's alleged misinterpretation of the 29 Dec. License in *NeuroGrafix I*, the Court concluded in the 8 May Order plaintiffs were attempting to relitigate whether the 29 Dec. License transferred the necessary rights in the '360 patent.

    **c.  Whether the 29 December License Expired and the 7 December License Resumed Status as the Operative Agreement**

### i. Expiration of the 29 December License

Even if plaintiffs did properly raise expiration of the 29 Dec. License in the original briefing on the government's motion to dismiss, plaintiffs did not provide sufficient evidence for expiration. Plaintiffs repeatedly reference the alleged expiration of the 29. Dec. License and consistently refer to the agreement as an "encumbrance." *See, e.g.*, Mot. for Recons. at 3 ("The expired irrelevant agreement upon which the Court clearly based its ruling is the [29 Dec. License]"); *id.* ("[t]hat contract of December 29, 1998 was an encumbrance delivering rights to NeuroGrafix"); *id.* at 6 ("in a suit filed by NeuroGrafix in 2012, the Court ruled on an encumbering contract between the [WRF] and NeuroGrafix which was dated 12/29/1998"). Yet the plain language of the 29 Dec. License does not support either of these contentions.

In the motion for reconsideration, plaintiffs assert the promissory notes from WRF to NeuroGrafix, the original 29 Dec. License, or both, encumbered the 7 Dec. License. *See* Mot. for Recons. at 4 ("It is true that the [7 Dec. License] was encumbered by a separate agreement of December 29, 1998 between the Washington Research Foundation and NeuroGrafix . . . . That encumbrance was imposed to enforce repayments to WRF due to loan notes of hundreds of thousands of dollars of costs which WRF incurred in the filing and prosecution of the patent."). According to plaintiffs, although "[t]hat encumbering contract was still in force in June of 2012 when [*NeuroGrafix I*] was filed[,] [i]t was amended by a 2012 update but it still acted to preserve WRF's financial rights." *Id.* Sometime after the filing of *NeuroGrafix I*, however, "the loan notes were paid off and the contract expired through maturation and termination of all duties that might trigger reversion of rights to WRF." *Id.*

An encumbrance is a "claim or liability that is attached to property or some other right and that may lessen its value, such as a lien or mortgage; any property right that is not an ownership interest. An encumbrance cannot defeat the transfer of possession, but it remains after the property or right is transferred." *Encumbrance*, Black's Law Dictionary (11th ed. 2019). Contrary to plaintiffs' argument, the expiration of an encumbrance does not trigger expiration of the underlying agreement. There is also no language in the original 29 Dec. License, or the accompanying promissory notes, to indicate complete payment of the notes will lead to termination of the 29 Dec. License. *See* 29 Dec. License. In fact, the 2012 Amendment to the 29 Dec. License states "[NeuroGrafix] has delivered to WRF all payments specified in a promissory note for $74,000. In addition, [NeuroGrafix] has delivered to WRF payments covering the balance of patenting expenses incurred before and after the Agreement Date." 2012 Amendment at 6. If the 29 Dec. License were merely an encumbering right as characterized by plaintiffs, payment of the note itself would have terminated such an encumbering right without need for the 2012 Amendment.

Plaintiffs' statements and other terms of the various agreements further contradict the argument regarding expiration of the 29 Dec. License. The stated term of the 2012 Amendment is "[f]rom the Amendment Date until the last of the Patent Rights, including all rights to pursue claims against Third Party infringers, expires, unless the Amendment is otherwise terminated by operation of law." 2012 Amendment at 9. Plaintiffs also state the original 29 Dec. License "was still in force in June of 2012 when the [NeuroGrafix] v US action was filed. It was amended by a 2012 update but it still acted to preserve WRF's financial rights." Mot. for Recons. at 4.

Referring to the 2012 Amendment, plaintiffs state the "WRF replaced [the 29 Dec. License] with a non-terminable agreement." Pls.' Reply at 9. None of plaintiffs' other statements made before dismissal regarding reversionary rights in the 29 Dec. License cite any evidence to support plaintiffs' argument regarding expiration of the 29 Dec. License.[8]

The only direct evidence plaintiffs cite for expiration of the 29 Dec. License is "Clauses §9.3a and §9.3c" of the 21 Dec. License. Pls.' Reply at 12. Section 9.3(a) states:

> [NeuroGrafix's] failure to perform in accordance with section 9.1 shall be grounds for [NeuroGrafix-Sole Proprietorship] to terminate this Agreement in whole or, at the election of [NeuroGrafix-Sole Proprietorship], in part as to particular Territories that are not being diligently pursued as required by section 9.1. Upon such termination, all affected rights and interest to the Licensed Technology and the Patent Rights shall revert to [NeuroGrafix-Sole Proprietorship]. If [NeuroGrafix-Sole Proprietorship] elects to terminate this Agreement under the terms of this section, said termination shall be the sole remedy except for the right to recover attorney's fees, if any, as provided in Section 21.

21 Dec. License at 11. Section 9.3(c) states:

> In all cases, [NeuroGrafix] will be given six months from the date of [NeuroGrafix-Sole Proprietorship's] written notification of non-performance in which to show reasonable progress in any region (one of the 20 most populous metropolitan areas in the US or one of the 5 most populous metropolitan areas in Australia) where [NeuroGrafix-Sole Proprietorship] believes there is inadequate diligence. In no case will [NeuroGrafix-Sole Proprietorship] be entitled to notify [NeuroGrafix] of any failure to perform as to a particular region until two calendar years from the Agreement Date. In addition, there will be no failure to perform in a region if Image Neurography services covered by the Patent Rights are available within 100 miles of a region.

*Id.* Plaintiffs do not point to any language in these sections which would cause the original 29 Dec. License, rather than the 21 Dec. License, to expire. This evidence was available for plaintiffs to cite pre-dismissal and therefore is not appropriately raised for the first time under a motion for reconsideration. *Bluebonnet Sav. Bank*, 466 F.3d at 1361 ("[A]n argument made for the first time in a motion for reconsideration comes too late."). Assuming plaintiffs cited this evidence prior to dismissal, plaintiffs do not provide written notification of non-performance

---

[8] Plaintiffs make several statements about the 29 Dec. License that are unrelated to dismissal: "[WRF] established an intervening direct exclusive license between WRF and NeuroGrafix directly which inserted reversion rights in the patent against any default by [NeuroGrafix] due to failure to adequately commercialize or failure to pay certain notes which WRF issued to recoup its patenting expenses." Opp'n to MTD at 9; "[A]s of December of [sic] 29, of 1998, [NeuroGrafix] held an exclusive license to all Patent Rights, but 1) owed royalties, development performance and loan payments to WRF under a reversionary right of WRF. At the same time [NeuroGrafix] 2) owed royalties to Aaron G. Filler ([NeuroGrafix-Sole Proprietorship]) with a reversionary right to [NeuroGrafix-Sole Proprietorship]. In the event of this reversion occurring, [NeuroGrafix-Sole Proprietorship] would be liable for the performance, royalties and note payments to WRF." *Id*; "[B]etween December 29 of 1998 through October 1 of 2012, there was an intervening right of reversion provided to [WRF] in respect of its promissory notes." *Id.* at 7–8.

required under § 9.3(c) to terminate the agreement for inadequate diligence.  While the original 29 Dec. License contains similar language, the 2012 Amendment to the 29 Dec. License explicitly states NeuroGrafix acted with due diligence.  *See* 29 Dec. License at 13;  2012 Amendment at 9 ("Licensee, directly or through Strategic Partners, is deemed to have used reasonable efforts to develop, market and sell Licensed Products, subject to prudent business judgment.").

Plaintiffs failed to present sufficient evidence of the agreement's expiration, even assuming plaintiffs properly raised the issue of the 29 Dec. License's expiration in the original briefing on the government's motion to dismiss.  Therefore, the Court finds plaintiffs have not demonstrated manifest injustice under RCFC 59(a)(1)(A) due to clear factual error by the Court regarding the expiration of the 29 Dec. License.  *See Biery*, 818 F.3d at 711.

### ii. Plaintiffs Argue the 7 Dec. License Serves as the Operative Agreement

Plaintiffs argue the 7 Dec. License was the controlling agreement vesting plaintiffs with the right to assert the '360 patent against the government.  *See* Mot. for Recons. at 6.  Although plaintiffs state the 7 Dec. License was controlling, they also assert the 21 Dec. License was controlling and assert both licenses together form the basis of the action.  *See* Opp'n to MTD at 16 (The 7 Dec. License "is the [b]asis of the [c]urrent [a]ction");  First Am. Compl. at 9 (the 29 Dec. License "is superseded by the superior earlier [21 Dec. License]");  Opp'n to MTD at 3 (NeuroGrafix's "primary license was from NeuroGrafix-Sole Proprietorship");  *Id.* at 17 (the 21 Dec. License "is now understood to have been the source of controlling ownership as to at least Filler's rights being exercised by licensee NeuroGrafix between June 15, 2012 and . . . October 1, 2013");  *Id.* at 4 ("The current case is based on an entirely different set of exclusive licenses in which NeuroGrafix-Sole Proprietorship was a party and in which the previously adjudicated [2012 Amendment] plays no controlling role.").  Additionally, plaintiffs argue NeuroGrafix, rather than Filler, held the right to sue the government during the period of alleged infringement.[9]  *See, e.g. id.* at 8 ("[A]t least between October 1 of 2012 and October 1 of 2013, NeuroGrafix held an exclusive right to sue and it held the right to sue governments without joining any other entity.");  First Am. Compl. at 9 ("NeuroGrafix held exclusionary rights against the United States with no limitations, commencing from October 1, 2012 when all reversionary rights to other entities expired and through the expirations of the patent on October 1, 2013.").  None of plaintiffs' other statements made before dismissal regarding the 7 Dec. License support plaintiffs' new argument that the 7 Dec. License is the sole controlling license.[10]

---

[9] Plaintiffs cite language in the licenses contradicting the argument that the 7 Dec. License superseded the 29 Dec. License.  For example, the 7 Dec. License states the "WRF shall be entitled to supplement and *replace* this agreement with a confirmatory Agreement with the same terms, directly between WRF and its planned successor, NeuroGrafix." 7 Dec. License at 4 (emphasis added).  The 21 Dec. License states "[w]here any conflicts may arise between rights & obligations owing between [NeuroGrafix] and WRF on the one hand and rights & obligations owing between [NeuroGrafix] and [NeuroGrafix-Sole Proprietorship] on the other, WRF shall take precedence over [NeuroGrafix-Sole Proprietorship]." 21 Dec License at 6, *cited in* Opp'n to MTD at 17.

[10] Plaintiffs make several statements about the 7 Dec. License that are unrelated to dismissal.  *See, e.g.*, First Am. Compl. at 8 ("On December 7, 1998, the Washington Research Foundation exclusively licensed all rights that it had – excepting certain reversion rights – to [NeuroGrafix-Sole Proprietorship].");  *Id.* at 9 ("The [7 Dec. and 21 Dec. Licenses] explicitly identified the grant of an exclusionary right (from Section 2 of the agreements) against the United States in Section 10 of the agreement, not that the exclusionary right would only be limited if there were

The government did not mention the 21 Dec. License in its reply brief in support of the motion to dismiss and limited its response to plaintiffs' arguments regarding the 7 Dec. License in a footnote:

> NeuroGrafix points out that there were actually two December 1998 Agreements, one with [NeuroGrafix-Sole Proprietorship] (i.e., Dr. Filler) on December 7, 1998 and the December 29, 1998 Agreement with [NeuroGrafix]. By NeuroGrafix [sic] account, however, [NeuroGrafix] succeeded to all rights previously held by [NeuroGrafix-Sole Proprietorship] through the [21 Dec. License]. Accordingly, we ignore the earlier assignment and go directly to the December 29, 1998 that was in effect until the 2012 agreement.

Gov't Reply at 13 n.8 (internal citations omitted). Accordingly, the Court did not rule on the issue as it was neither fully briefed nor supported by the factual record. After plaintiffs attempted to take a second bite of the apple on the motion for reconsideration, the government did not find plaintiffs' arguments credible:

> Plaintiffs further suggest that somehow the December 7, 1998 Agreement had been in hibernation during the December 29, 1998 Agreement and 2012 Restated Agreement but came back to life with the expiration of those two agreements. This argument, however, finds no support in the documents or the history of the many cases that were brought pursuant to those agreements.

Resp. to Mot. for Recons. at 10. The Court agrees with the government's assessment that plaintiffs' theory regarding the apparent reinstatement of either the 7 Dec. License or the 21 Dec. License following the alleged expiration of the 29 Dec. License lacks factual support in the record. Therefore, the Court finds plaintiffs have not demonstrated manifest injustice under RCFC 59(a)(1)(A) due to clear factual error by the Court regarding the controlling status of the 7 Dec. License. *See Biery*, 818 F.3d at 711.

### d. Whether the 7 December License Granted Filler the Right to Sue the Government

#### i. This Court's Previous Decision in *NeuroGrafix I* Regarding the 29 December License

---

grants from the United States for the development of the technology."); Opp'n to MTD at 7 ("On December 7, 1998, the WRF exclusively licensed the '360 patent to Aaron G. Filler personally as NeuroGrafix, Sole Proprietorship."); *Id.* ("The existence and importance of the ELA between WRF and Aaron G. Filler-AKA NeuroGrafix-SP [] is well documented."). Plaintiffs then summarize the constraints regarding Filler's employment at UCLA and the corporate structure of the NeuroGrafix entities that compelled them to execute the 7 Dec. License. *See, e.g. id.* at 8 ("[The] right to sue governments was conveyed properly to NeuroGrafix-Sole Proprietorship from [UW]."); *id.* at 14 (noting the rights conveyed by UW to WRF "were all conveyed to Filler in the December 7, 1998 agreement so that as of that time – Filler held not only his own rights in ownership of the '360 patent, but also held the ownership rights of Tsuruda, Richards and Howe by exclusive license").

In *NeuroGrafix I*, this Court found the 1994 License and the 29 Dec. License did not transfer to plaintiffs the right to enforce the '360 patent against the government:

> In the [1994 License], the Court finds support for the conclusion that [the Washington Research Foundation] retained the right to sue governmental parties. Like the [29 Dec. License], the [1994 License] contains a definition of "Third Party": "corporate entities or individuals other than [the Washington Research Foundation] or [the University of Washington]." As with the [29 Dec. License], the [1994 License] grants the licensee ([the Washington Research Foundation]) the right to bring suit against such Third Parties. Although the Court makes no decision on this point, the [1994 License] indicates that at least [the Washington Research Foundation] was aware that the United States could qualify as a Third Party: in an Article entitled "Third Party Rights," two of the three provisions deal with potential rights that the United States government may have in the technology being licensed. The presence of the United States in these "Third Party Rights" provisions in the [1994 License]—and the complete lack of a similar language in the [29 Dec. License]—tells the Court that [the Washington Research Foundation] did not intend to grant [NeuroGrafix] the right to sue the United States. . . . The parties expressly defined "Third Party" in a manner that does not include the United States, and [NeuroGrafix] received the right only to sue Third Parties. Whatever the extent to which [the Washington Research Foundation] has a right to sue the United States (and the Court makes clear that it makes no finding on that point), [the Washington Research Foundation] did not pass that right on to [NeuroGrafix].

*NeuroGrafix I*, 111 Fed. Cl. at 507–08 (internal citations omitted). In *Filler*, the Court extended the decision in *NeuroGrafix I* to the 2012 Amendment of the 29 Dec. License, finding plaintiffs were collaterally estopped from relitigating the issue:

> The 2012 Amendment does not materially alter any of the provisions of the 1998 License interpreted by this Court in *NeuroGrafix I* for determining what rights were transferred to the plaintiffs in the [29 Dec. License]. Therefore, the 2012 Amendment presents an identical issue regarding the transfer of ownership of the right to enforce the '360 patent against the government as the [29 Dec. License].

*Filler* at 138.

### ii. Application of the Principles of this Court's Decision in *NeuroGrafix I* to the 7 December License

Even if the Court considers plaintiffs' arguments regarding expiration of the 29 Dec. License and a return to the 7 Dec. License as the operative agreement properly raised, the 7 Dec. License similarly did not grant Filler the right to assert the '360 patent against the government. "Contract interpretation begins with the plain language of the agreement." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991); *see also Gardiner, Kamya & Associates, P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006) ("In construing the contract to determine whether it is ambiguous, we keep in mind [the] well-settled principles of contract interpretation. We

begin with the plain language of the contract.") (citing *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993)) ("A contract is read in accordance with its express terms and the plain meaning thereof."). When "the language is sufficiently clear," the Court's "inquiry ends there." *Textron Defense Sys. v. Widnall*, 143 F.3d 1465, 1469 (Fed. Cir. 1998) (citing *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed. Cir. 1991) ("In contract interpretation, the plain and unambiguous meaning of a written agreement controls.")).

The 7 Dec. License specifically grants Filler the right to sue a "Third Party" for infringement pursuant to Section 7:  Infringement Actions:

> If, during the term of this Agreement, WRF or Licensee shall suspect that one or more *Third Parties* are infringing or are threatening to infringe the Patent Rights, that Party shall immediately provide the other Party all available and useful information concerning the kind and character of the infringement and any other pertinent information. . . . License will have primary responsibility in dealing with any infringing parties.  Only so long as Licensee has exclusive rights under this Agreement.[11]  Licensee shall have the first right to grant a Sublicense to such *Third Party*, or to bring, at no expense to WRF, an infringement action against the *Third Party* and to use WRF's name in connection therewith as needed.

7 Dec. License at 10.  In identical terms to the 29 Dec. License, the 7 Dec. License provides an express definition of "Third Party:" "any individual, corporation, partnership or other business entity other than WRF, Licensee, Affiliates and Sublicensees."  7 Dec. License at 5;  29 Dec. License at 5.  Noticeably absent from this list is the federal government, or any governmental entity.  Consistent with the Supreme Court's interpretation, "[i]n the absence of an express . . . definition, the Court applies a 'longstanding interpretive presumption that 'person' does not include the sovereign.'"[12]  *Return Mail, Inc. v. United States Posta Service*, 139 S.Ct. 1853, 1861–62 (2019) (quoting *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780–81 (2000)).

In the interpretation of a contract, "express terms are given greater weight than course of performance, course of dealing, and usage of trade" and "specific terms and exact terms are given greater weight than general language."  Restatement (Second) of Contracts § 203(b–c).

---

[11] The government alludes to the presence of multiple "exclusive" licenses throughout its response brief. *See, e.g.*, Resp. to Mot. for Recons. at 5 ("Some three weeks later, WRF entered into another 'exclusive' license agreement with the NeuroGrafix (corporation)."); *id.* at 6 ("As a result, during the January 31 to October 1, 2013 period, there were two 'exclusive licensees,' each holding rights antithetical to the other's authority.").  Though the Court does not reach this line of argumentation as to the seemingly multiple "exclusive" licenses granted by WRF, the language of Section 7.2 of the 7 Dec. License seems to suggest Filler's subsequent grant of a license to NeuroGrafix via the 21 Dec. License voided Filler's ability to enforce the '360 patent against any alleged infringer, whether a third party or government entity.

[12] While the Supreme Court was reviewing statutory language in *Return Mail*, as opposed to the Court's review here of contractual language, the general principle regarding the exclusion of the sovereign in the absence of its' express inclusion is nonetheless applicable in both contexts.  *See, e.g.*, *Stone v. Signode Indus. Grp.*, 943 F.3d 381, 389 (7th Cir. 2019) ("While contract interpretation differs from statutory interpretation in some ways, this principle applies in both: the actions of courts have given the phrase a meaning that parties knowledgeable in the relevant areas of law are presumed to use.").

Applying these principals to the 7 Dec. License, the express definition of "Third Party" as provided in the agreement does not include the government.  "Third Parties" are expressly defined as individuals or business entities; not government entities.  "Contracts are not necessarily rendered ambiguous by the mere fact that the parties disagree as to their meaning." *Southern Const. Co. v. United States*, 176 Ct. Cl. 1339, 1361 (1966).  It is not within the province of the Court to expand the scope of a contract beyond the intent of the parties as reflected within the plain meaning of the contractual language itself.  *See Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 946 F.3d 1354, 1359 (Fed. Cir. 2020) ("[A] court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent.").  The plain meaning of the language in the 7 Dec. License grants plaintiffs the right to enforce the '360 patent against "Third Parties," and "Third Parties" as defined in the 7 Dec. License does not include the government.

      Plaintiffs further argue the 7 Dec. License grants Filler the right to sue the government because of "a Bayh-Dole exclusion."  Pls.' Reply at 11.  Though plaintiffs do not cite to any particular section of the license, the Court understands plaintiffs to refer to Section 10: Government Rights:

> The Parties acknowledge that if the Technology was funded by grants from the U.S. Government, the Patent Rights will be subject to the rights and limitations of United States Code, Title 35, Chapter 18, and implementing regulations thereof, and that the grant under Section 2.1 of this Agreement will be subject to such rights and limitations.  In particular, in that event, Licensed Products sold in the United States must be manufactured substantially in the United States so long as this license remains exclusive.

7 Dec. License at 12.  While Section 10 of the 7 Dec. License references the United States, there is nothing in this section to suggest a transfer of the right to enforce the '360 patent against the government.  Rather, this section only addresses possible involvement of the United States in the funding of the technology, as well as a limitation on the location of manufacture.  While Title 35, Chapter 18 of the United States Code is referenced in Section 10, this chapter, as indicated by its title, relates to "Patent Rights in Inventions Made with Federal Assistance."  Whether or not the federal government was involved in the funding of the technology of the '360 patent and thus reserved any "march-in" or other similar rights is not the issue before the Court, and the Court makes no ruling on such a matter.  Here, plaintiffs assert a cause of action under 28 U.S.C. § 1498 alleging the government infringes the '360 patent.  A reference to Chapter 18 of Title 35 of the United States Code is insufficient to grant such enforcement rights to the licensee, particularly in view of the agreement's express definition of "Third Party" which excludes the government.  The Court does not agree with plaintiffs that this section grants Filler the right to enforce the '360 patent against the government.  Nothing in this section indicates the government is included in the definition of "Third Party," and Filler was only granted the right to enforce the '360 patent against "Third Parties."

      Lastly, plaintiffs refer back to this court's decision in *NeuroGrafix I*.  Plaintiffs characterize this earlier decision as holding "language citing to the Federal rights attaching to inventions where the Federal Government funded the invention conducted a right to sue," and

"in the absence of such language no right to sue the US Government would arise." Mot. for Recons. at 10 (emphasis omitted). Plaintiffs thus conclude in *NeuroGrafix I*, this court "explicitly found the absence of those terms in the [Dec. 29 License] and therefore found no standing." *Id.* (emphasis omitted). According to plaintiffs, in the present case, they "showed the presence of the required terms in the [7 Dec. License]," but "[t]he Court has now reversed itself and found there is no standing when the language is present, when previously it found that there is no standing when the language is absent." *Id.* (emphasis omitted).

Plaintiffs' argument is premised first on a fundamental misunderstanding of the *NeuroGrafix I* decision, followed by a fundamental misunderstanding of *Filler*. In *NeuroGrafix I*, this court looked to the 1994 License for a comparison of similar language regarding "the right to sue governmental parties." *NeuroGrafix I*, 111 Fed. Cl. at 507. While this court made clear it was "mak[ing] no decision on this point," it found the 1994 License contained two provisions discussing "Third Party Rights" which "deal[t] with potential rights that the United States government may have in the technology being licensed." *Id.* This court thus concluded, "[t]he presence of the United States in these "Third Party Rights" provisions in the [1994 License]—and the complete lack of a similar language in the [29 Dec. License]—tells the Court that WRF did not intend to grant [NeuroGrafix] the right to sue the United States." *Id.* It is true Article 3 of the 1994 License discusses similar provisions to that of Section 10 of the Dec. 7 License. Plaintiffs, however, completely read out a critical portion of this court's analysis: "[t]he presence of the United States in these '*Third Party Rights*' provisions." *Id.* While the 1994 License contains a similar provision explicitly defining "Third Parties" without including the government, the 1994 License then goes on to discuss the government under a section specifically labeled "Third Party Rights." *Id.* The 1994 License thus contains at least conflicting authority as to whether the government was intended to be included under the express definition of a "Third Party."

This is in stark contrast to the 7 Dec. License. Far from plaintiffs' characterization of "show[ing] the presence of the required terms in the [7 Dec. License]," plaintiffs instead highlight the significant differences between these agreements. The 7 Dec. License makes no conflicting reference to the government being expressly defined or referred to as a "Third Party" anywhere in the agreement. Section 10 of the 7 Dec. License is specifically labeled "Government Rights," as opposed to the "Third Party Rights" section of the 1994 License. Plaintiffs' argument that they somehow now show the presence of this language is further contradicted by the fact that the 29 Dec. License, analyzed by this court in *NeuroGrafix I*, includes an identical Section 10: Government Rights as the 7 Dec. License. *Compare* 7 Dec. License at 13 *with* 29 Dec. License at 14. Just as Judge Damich found in *NeuroGrafix I*, Section 10 of the 29 Dec. License did not contain language labeling the government a "third party," the Court here finds the 7 Dec. License similarly failed to include such language. Plaintiffs contention that they "showed the presence of the required terms in the [7 Dec. License]" is wrong. Mot. for Recons. at 10. All plaintiffs have done is present the same arguments and the same language regarding the definition of "Third Party," albeit language contained in a "different" agreement.

The Court thus finds the 7 Dec. License did not transfer from WRF to Filler the right to enforce the '360 patent against the government. Though not binding on the Court's

determination, this interpretation of the 7 Dec. License is consistent with this court's previous interpretation of similar language contained in the 29 Dec. License in *NeuroGrafix I*.  In *NeuroGrafix I*, this court found the definition of "Third Party" to be "quite clear: 'Third Party' is limited to a set of entities." *NeuroGrafix I*, 111 Fed. Cl. at 506.  This court did not find the government to be part of any category within the set of parties expressly provided in the licensing agreement. *Id.*  Accordingly, this court was "not persuaded by [plaintiffs'] attempts to expand the scope of the contract beyond the plain meaning of its language." *Id.*  Turning next to external evidence, this court further drew "some degree of intent from the fact that the parties defined 'Third Party' more narrowly than the ordinary meaning would allow." *Id.* at 507.  "Thus, the ordinary meaning of the term 'third party,'" as between WRF and Filler, "would encompass *anybody else*." *Id.*  "The fact that the parties built their definition of 'Third Party' from the ground up, rather than from the broadest ordinary meaning, implies that the parties intended to place some limit on the term." *Id.* (footnote omitted).  "Because nothing solidly evidences any intent either way, the Court [was] left to return to the plain language of the definition adopted by the parties." *Id.* (citing Restatement (Second) of Contracts § 201(1) ("Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.")).

Even assuming plaintiffs were able to allege sufficient facts to support expiration of the 29 Dec. License and a return to operation under the 7 Dec. License, the Court finds the 7 Dec. License similarly failed to grant Filler the necessary rights to assert infringement against the government.  Accordingly, plaintiffs' motion for reconsideration as to the second argument—whether the Court properly considered the correct licensing agreements—is denied. *Biery*, 818 F.3d at 711 (quoting *Young*, 94 Fed. Cl. at 674) ("Under [RCFC] 59(a)(1), a court, in its discretion, 'may grant a motion for reconsideration when there has been an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice.'").

### iii. Dr. Filler's Standing to Assert the '360 Patent Against the Government

A review of the necessary licensing agreements underlying plaintiffs' cause of action allows the Court to now return to Dr. Filler's standing to bring suit.  Neither the 7 Dec. License nor the 29 Dec. License, under any of the theories presented by plaintiffs, transferred Dr. Filler the right to assert the '360 patent against the government.  Plaintiffs' lone theory of establishing standing requires the Court to recognize one of the December 1998 licenses as an exclusive license sufficient to confer standing on plaintiff to assert the '360 patent. *Prima Tek II*, 222 F.3d at 1377 ("an exclusive, territorial licensee is equivalent to an assignment and may therefore confer standing upon the licensee to sue for patent infringement").  "[T]o assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title at the inception of the lawsuit." *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003) (internal citation omitted).

As this Court noted in *NeuroGrafix I*:

> The Federal Circuit has explained that there are three categories of standing for a potential plaintiff in patent cases: (1) those that hold all substantial rights in the patent; (2) those that hold exclusionary rights granted by the patent, but not all substantial rights in the patent; and (3) those that do not even hold exclusionary rights under the patent.

*NeuroGrafix I*, 111 Fed. Cl. at 504 (citing *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339–40 (Fed. Cir. 2007)). "In order to transfer all substantial rights, an agreement must 'convey[] *in full* the right to exclude others from making, using and selling the patented invention in the exclusive territory.'" *Id.* at 505 (quoting *Prima Tek II*, 222 F.3d at 1377). Thus, where a party falls under this second category as a holder of exclusionary rights, but not all substantial rights in the patent, the right "must be enforced through or in the name of the owner of the patent." *Morrow*, 499 F.3d at 1340.

Dr. Filler did not receive "all substantial rights in the patent" under either the 7 Dec. License or the 29 Dec. License. Neither the 7 Dec. License nor the 29 Dec. conferred to Dr. Filler the right to assert the '360 patent against the government. Accordingly, any action asserting the '360 patent under § 1498 based on a transfer of rights pursuant to the December 1998 licensing agreements for the time period discussed herein "must be enforced through or in the name of the owner of the patent." *Morrow*, 499 F.3d at 1340. Dr. Filler, as the sole plaintiff of this action at the inception of the lawsuit, lacked standing to assert the '360 patent for a cause of action under 28 U.S.C. § 1498.

### V.   Application of the Doctrine of Collateral Estoppel in the Court's 8 May 2020 Order

#### a. Parties Arguments

Plaintiffs further argue "the Court has used the term 'Collateral Estoppel' but in fact it has performed a cross party 'Collateral Reversal.'" Mot. for Recons. at 10. Plaintiffs view the Court's 8 May 2020 order as finding "there is no standing when the language [in the license regarding government rights] is PRESENT, when previously it found that there is no standing when the language is ABSENT." *Id.* Plaintiffs' position is best characterized as follows:

> [The Court] is asserting that if it made a mistake that was not challenged, this mistake can then be applied to entirely different parties in entirely different contracts who not only could not litigate or appeal but who had no basis to expect an obvious error in a litigation to be forced into other business.

*Id.* Plaintiffs further argue "[b]ecause Filler was not a party to [*NeuroGrafix I*] he cannot have had a full and fair opportunity to litigate the issue." Mot. for Recons. at 5. The Court addressed this issue in the *Filler*:

> All plaintiffs in the present action therefore had a strong incentive to fully litigate the issue in *NeuroGrafix I*. Plaintiffs stated during oral argument that the decision not to appeal this Court's decision in *NeuroGrafix I* was a deliberate business decision in favor of the multi-district litigation, as plaintiffs purportedly disagreed

with this Court's decision in *NeuroGrafix I* at the time it was rendered.  *See* Tr. at 29:1–5, ECF No. 45.  Application of the doctrine of collateral estoppel cannot be avoided as a result of such strategic decisions or disagreements with a legal ruling.  *Banner*, 238 F.3d at 1355 ("The mere disagreement with a legal ruling does not mean that a party has been denied a 'full and fair' opportunity to litigate.").  A party need not exercise their right to an appeal; collateral estoppel simply "requires that a party have had an opportunity to appeal a judgment as a procedural matter." *Id.*

Lastly, plaintiffs provide no evidence of effective litigation being limited by the relationship of the parties.  Nothing before the Court suggests a material limitation was placed on the various plaintiffs as a result of their relationship with one another.  Plaintiffs do not allege they were deprived a fair opportunity to litigate this issue; rather, plaintiffs focus purely on the introduction of new evidence in the form of additional licensing agreements in an attempt to escape this Court's previous findings.

*Filler* at 139.

The government argues "it is now beyond cavil that 'a non-party may be bound by a judgment if one of the parties to the earlier suit is so closely aligned with the non-party's interests as to be its virtual representative.'"  Resp. to Mot. for Recons. at 11 (quoting *Mother's Rest, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1572 (Fed. Cir. 1983)).  Noting Dr. Filler himself was not a party to *NeuroGrafix I*, "Dr. Filler certainly participated in control of the previous litigation.  Notably, all of the juristic entities who participated in either case were organized and/or controlled by Dr. Filler." *Id.*  The government thus concludes "although Dr. Filler and NeuroGrafix SP were not named parties, each was in privity with all plaintiff parties in the 2012 litigation." *Id.* at 12.

### b. Whether the Court's 8 May 2020 Order Correctly Applied the Doctrine of Collateral Estoppel

Plaintiffs fundamentally misunderstand the Court's decision in the *Filler*.  The Court did not hold "there is no standing when the language [in the license regarding government rights] is [present]."  Mot. for Recons. at 10.  Rather, the Court refused to allow plaintiffs to relitigate "[t]he issue of whether plaintiffs received the right to enforce the '360 patent against the government" in the 29 Dec. License.  *Filler* at 138.  The Court also did not apply collateral estoppel to an "entirely different contract[]," presumably the 7 Dec. License, or to "entirely different parties."  Mot. for Recons. at 10.  The Court found "[n]either the 1994 License, the [29 Dec.] License, nor the 2012 Amendment transferred the right to enforce the '360 patent against the government to any of the plaintiffs in the present case" based on *NeuroGrafix I*.  *Filler* at 139.

To the extent plaintiffs attempt to dispute the Court's finding on this point in the motion for reconsideration, plaintiffs had every opportunity to raise such arguments when briefing the motion to dismiss but chose not to do so.  While the Court sees no error in its previous analysis

on this point, the following discussion is provided to clarify plaintiffs' misunderstanding of the law.

The Court recognizes the "general rule against nonparty preclusion, subject to certain exceptions." *WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1319 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 1216 (2019) (citing *Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008)).  Among those factors in a non-exhaustive list to be considered in finding whether a non-party to the previous litigation was in privity with those plaintiffs are:  "pre-existing substantive legal relationships between the person to be bound and a party to the judgment;" "adequate representation by someone with the same interests who was a party;" "assumption of control over the litigation in which judgment was rendered;" and "where the nonparty to an earlier litigation acts as a proxy for the named party to relitigate the same issues." *Id.* at 1319 (Fed. Cir. 2018) (internal citations omitted), (citing *Taylor*, 553 U.S. at 894–95; *see also Mother's Rest.,*. 723 F.2d at 1572 (citing Restatement (Second) of Judgments § 39 (1980) and *Montana v. United States*, 440 U.S. 147, 154 (1979)).

As the government points out, "Dr. Filler planned and organized each of the juristic entities [from *NeuroGrafix I*]."  Gov't Resp. at 12 (citing Opp'n to MTD at 6–7).  As the Court noted in *Filler*, Filler played a significant role in the business dealings of each of the named plaintiffs:  he was either the individual himself (Filler); a sole proprietorship (Neurografix-Sole Proprietorship); or the President, CEO, or Medical Director of the business entity (NeuroGrafix, NIMA, and IBS).  *Filler* at 139.  As Filler indicated during oral argument on the motion to dismiss, the decision not to appeal this Court's decision in *NeuroGrafix I* was strictly a business decision.  *Id.* at 137 (citing Tr. at 28:15–29:5).  Filler, as one of the inventors of the patent, the alleged exclusive licensee in his own personal capacity and through his sole proprietorship, the individual with the authority to render business decisions over the various business entities involved in *NeuroGrafix I*, and the attorney now handling the present litigation, has always been the party with control over litigating infringement of the '360 patent.

Application of the doctrine of collateral estoppel  "preclude[s] parties from contesting matters that they have had a full and fair opportunity to litigate," thus "protect[ing] their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. at 153–54.  "These interests are similarly implicated when nonparties assume control over litigation in which they have a direct financial or proprietary interest and then seek to redetermine issues previously resolved." *Id.* at 154.  The Supreme Court has thus observed the application of the doctrine of collateral estoppel applies to "the persons for whose benefit and at whose direction a cause of action is litigated." *Id.*  Thus, one "'who assists in the prosecution or defense of an action in aid of some interest of his own . . . is as much bound . . . as he would be if he had been a party to the record.'" *Id.* (quoting *Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 262 n.4 (1961)).

The Federal Circuit has similarly affirmed a district court's application of collateral estoppel where an individual plaintiff assumed control of the litigation under similar circumstances as those presented in this case:

> [The plaintiff] actively participated in the [prior] litigation as the principal agent of her company, and [the plaintiff's] interest in those actions was identical to those of her company. The district court held that [the plaintiff] is bound by the prior judicial determinations against [the plaintiff's company], and that [the plaintiff] is estopped from relitigating those claims against [the defendant]. No error has been shown in this ruling, and in the dismissal on this ground.

*Yip v. Hugs to Go LLC*, 377 Fed. App'x 973, 976–77 (Fed. Cir. 2010). Accordingly, Filler's privity with the various NeuroGrafix entities gave him a full and fair opportunity to litigate the issue of the rights assigned in the 29 Dec. License in *NeuroGrafix I*. The doctrine of collateral estoppel was thus appropriately applied to each of the plaintiffs in this case.[13]

## VI. Conclusion

The Court **ACCEPTS** plaintiffs' reply brief as if it was properly filed with a motion for leave to file a reply brief. The Court has considered all of plaintiffs' arguments. To the extent not discussed specifically herein, plaintiffs' other claims are unpersuasive, meritless, or unnecessary for resolving the issues currently before the Court. Accordingly, the Court hereby **DENIES** the plaintiffs' motion for reconsideration pursuant to RCFC 59(a)(1)(A).

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

[13] Plaintiffs attempt to argue, if the Court finds the various plaintiffs in privity with one another, such a finding would bar application of the Assignment of Claims Act to the various licensing agreements. Mot. for Recons. at 6 ("The Fact of the matter is that if the Court meant to find an alter ego relationship through its ruling, then it has voided the application of the Assignment of Claims Act as to the 2013 transfer, and it has rendered Filler as in full possession of all rights held by NeuroGrafix."). As none of the licensing agreements transferred the right to assert the '360 patent against the government to any of the plaintiffs in this action, the right to enforce the '360 patent against the government accordingly accrued to WRF until the final round of assignments in December 2013, which was after the '360 patent expired. Plaintiffs therefore must show they were in privity with WRF in order to avoid application of the Assignment of Claims Act, a point which plaintiffs readily conceded they could not do at oral argument on the motion to dismiss:

> THE COURT: But the alter ego issue is the transfer—is related to the WRF transfer to NeuroGrafix, right?
> DR. FILLER: Well, the alter ego issue would . . .
> THE COURT: I mean, it would have to say that WRF and NeuroGrafix are the same.
> DR. FILLER: That's not the case. WRF is a totally separate entity, yes. That's not alter ego.

Tr. at 82:9–16.